# Exhibit 1

**EXECUTION VERSION**

MANAGEMENT AND PRE-OPENING SERVICES AGREEMENT

BETWEEN

**MINNESOTA SPORTS FACILITIES AUTHORITY,**
a public body and political subdivision of the State of Minnesota

AND

**SMG,**
a general partnership
existing under the laws of the Commonwealth of Pennsylvania

**Dated as of August 22, 2014**

MSFA000033

**EXECUTION VERSION**

## TABLE OF CONTENTS

Page

| | | | |
|---|---|---|---|
| 1. | DEFINITIONS | | 1 |
| 2. | ENGAGEMENT OF THE MANAGER | | 11 |
| | 2.1 | Engagement | 11 |
| | 2.2 | Nature of Relationship | 12 |
| | 2.3 | Appointment of Authorized Representatives | 12 |
| 3. | STANDARD OF SERVICE | | 12 |
| | 3.1 | Standard | 12 |
| | 3.2 | Compliance with Other Agreements; No Amendments | 13 |
| | 3.3 | Limitation on the Manager's Duties | 13 |
| | 3.4 | Adjustments for Certain Modifications to the Stadium Site or Urban Park | 13 |
| 4. | PRE-OPENING SERVICES | | 14 |
| | 4.1 | General | 14 |
| | 4.2 | Consulting Services | 14 |
| | 4.3 | Manner of Performing Services | 23 |
| | 4.4 | Pre-Opening Consulting Budget | 23 |
| 5. | MANAGEMENT AND OPERATIONAL SERVICES | | 24 |
| | 5.1 | General Management and Operation Services | 24 |
| | 5.2 | Employees and Other Personnel | 25 |
| | 5.3 | Maintenance, Engineering and Custodial Services | 28 |
| | 5.4 | Security; Crowd Control; Traffic and Parking, Medical; and Safety | 30 |
| | 5.5 | Marketing of the Stadium Site and Urban Park and Permitting and Booking of Events | 31 |
| | 5.6 | Vendor Negotiation and Procurement | 32 |
| | 5.7 | Landscape Maintenance | 33 |
| | 5.8 | Field Maintenance | 34 |
| | 5.9 | Concession Agreement | 34 |
| | 5.10 | Right of Entry Reserved | 34 |
| | 5.11 | Tobacco/Chewing Gum | 34 |
| | 5.12 | Customer Surveys and Other Performance Measurements | 34 |
| | 5.13 | Limitation on Contracts Entered Into by the Manager | 34 |
| | 5.14 | Ancillary Services | 35 |
| 6. | AUTHORITY'S RESERVED RIGHTS | | 35 |
| 7. | UTILITIES | | 35 |
| 8. | CONFIDENTIALITY/NONDISCLOSURE | | 35 |
| | 8.1 | No Disclosure | 35 |
| | 8.2 | Confidential Information | 35 |
| | 8.3 | Manager's Confidential Information | 36 |
| | 8.4 | Specific Performance | 36 |
| 9. | SUBCONTRACTING | | 36 |
| | 9.1 | General Ability to Subcontract | 36 |
| | 9.2 | Restrictions on Subcontracting | 37 |

MSFA000034

EXECUTION VERSION

**TABLE OF CONTENTS**
(continued)

Page

| | | | |
|---|---|---|---|
| 10. | | TERM AND RENEWAL TERM | 37 |
| 11. | | COMPENSATION | 37 |
| | 11.1 | No Fee During Pre-Opening Period | 37 |
| | 11.2 | Manager Capital Investment | 37 |
| | 11.3 | Revenue Sharing and Manager's Compensation | 37 |
| 12. | | FUNDING; BUDGETS; BANK ACCOUNTS | 40 |
| | 12.1 | Operating Plan | 40 |
| | 12.2 | Operating Budget; Cash Flow Budget | 40 |
| | 12.3 | Capital Management and Planning | 40 |
| | 12.4 | Budget Modifications Proposed by the Manager | 41 |
| | 12.5 | Budget Modifications Proposed by the Authority | 41 |
| | 12.6 | Receipts and Disbursements | 41 |
| | 12.7 | Operating Funds | 42 |
| | 12.8 | Non-Funding | 42 |
| | 12.9 | Ticket Sales Revenues | 42 |
| | 12.10 | Capital Enhancements | 42 |
| | 12.11 | Funds for Emergency Repairs | 42 |
| | 12.12 | Financial Reports | 43 |
| 13. | | RECORDS, AUDITS AND REPORTS | 43 |
| | 13.1 | Records and Audits | 43 |
| | 13.2 | Accounting Records | 44 |
| | 13.3 | Management and Maintenance Plan | 44 |
| 14. | | INDEMNIFICATION AND INSURANCE | 45 |
| | 14.1 | Indemnification | 45 |
| | 14.2 | Liability Insurance | 46 |
| | 14.3 | Surety and Guaranty | 48 |
| | 14.4 | Workers Compensation and Employer's Liability Insurance | 48 |
| | 14.5 | Crime Coverage | 48 |
| | 14.6 | Property Insurance | 48 |
| | 14.7 | Certain Other Insurance and Indemnification | 49 |
| 15. | | OWNERSHIP OF ASSETS | 49 |
| 16. | | ASSIGNMENT; AFFILIATES | 50 |
| | 16.1 | No Assignment | 50 |
| | 16.2 | The Manager's Affiliates | 50 |
| 17. | | LAWS AND PERMITS | 50 |
| | 17.1 | Permits, Licenses, Taxes and Liens | 50 |
| | 17.2 | Compliance With Laws | 51 |
| 18. | | TERMINATION | 51 |
| | 18.1 | Termination Upon Default | 51 |
| | 18.2 | Termination Other than Upon Default | 52 |
| | 18.3 | Effect of Termination | 53 |

-ii-

MSFA000035

EXECUTION VERSION

**TABLE OF CONTENTS**
(continued)

Page

|  | 18.4 | Surrender of Premises | 53 |
| 19. |  | MISCELLANEOUS | 53 |
|  | 19.1 | Use of Stadium Site at Direction of Authority | 53 |
|  | 19.2 | Manager's Offices | 53 |
|  | 19.3 | Cooperation with Further Financing | 54 |
|  | 19.4 | Governing Law; Venue; Resolution of Disputes | 54 |
|  | 19.5 | Use of Stadium Names and Logos | 55 |
|  | 19.6 | Entire Agreement | 55 |
|  | 19.7 | Amendments | 55 |
|  | 19.8 | Force Majeure | 55 |
|  | 19.9 | Binding Upon Successors and Assigns | 56 |
|  | 19.10 | Third-Party Beneficiaries. | 56 |
|  | 19.11 | Notices | 56 |
|  | 19.12 | Severability | 58 |
|  | 19.13 | Counterparts | 58 |
|  | 19.14 | Non-Waiver. | 58 |
|  | 19.15 | Section Headings; Defined Terms | 58 |
|  | 19.16 | Governing Law | 58 |
|  | 19.17 | Certain Representations and Warranties | 58 |
|  | 19.18 | Calculation of Time | 59 |
|  | 19.19 | Data Practices Act | 59 |

MSFA000036

**EXECUTION VERSION**

## MANAGEMENT AND PRE-OPENING SERVICES AGREEMENT

THIS MANAGEMENT AND PRE-OPENING SERVICES AGREEMENT (the "Agreement") dated as of the 22nd day of August, 2014 (the "Effective Date"), by and between the Minnesota Sports Facilities Authority, a public body and political subdivision of the State of Minnesota (the "Authority"), and SMG, a general partnership existing under the laws of the Commonwealth of Pennsylvania (the "Manager"). The Authority and the Manager are sometimes individually referred to herein as a "Party" and are collectively referred to herein as the "Parties."

### RECITALS:

A.     In 2012, the Minnesota legislature, finding that the expenditure of public money for the construction, financing, operation, and long-term use of a multi-purpose stadium and related infrastructure as a venue primarily for the National Football League and a broad range of other civic, community, athletic, educational, cultural, and commercial activities (the "Stadium") serves a public purpose, enacted legislation (the "Act") creating the Authority and authorizing the construction of a stadium and related stadium infrastructure in the City of Minneapolis, Minnesota.

B.     The Act provides that the Authority controls, operates and has responsibility for the Stadium. The Authority has all powers, both specified and incidental, required to carry out the purposes of the Act, including, but not limited to, leasing, licensing or otherwise entering into use agreements, establishing rents, fees and charges thereunder, and developing, constructing, equipping, improving, owning, operating, managing, maintaining, financing, and controlling the Stadium. The Authority is required under the Act to report to the legislature regarding the Stadium and must take all actions necessary to meet this requirement.

C.     Pursuant to the Act, the Authority is empowered to enter into a contract for the management of the Stadium.

D.     The Manager is experienced and engaged in the business of providing management services, including pre-opening, management, operation and marketing services, for sports, entertainment, convention and other multipurpose facilities.

E.     The Authority desires to engage the Manager, and the Manager desires to accept such engagement, to provide management services and pre-opening services for the Stadium and the Urban Park on the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained, the Parties hereby agree as follows:

**1.     Definitions.** For purposes of this Agreement, the following terms have the meanings referred to in this Section 1:

"Act" shall have the meaning specified in Recital A.

1

"ADA" shall have the meaning specified in Section 17.2.

"Affiliate" shall mean a Person that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person. For purposes of this definition, "control" means ownership of equity securities or other ownership interests that represent more than fifty percent (50%) of the voting power in the controlled Person.

"Agreement" shall have the meaning set forth in the preamble to this Agreement.

"Approved Budget" shall mean any budget submitted by the Manager, as approved by the Authority pursuant to Section 12.2(c).

"Approved Operating Plan" shall have the meaning specified in Section 12.1.

"Authority" shall have the meaning specified in the first paragraph of this Agreement.

"Authority Event" shall mean any and all events or activities or any organized or put on by the Authority (or the licensee of or licensor to the Authority) that are not Team Events.

"Authority Indemnitees" shall have the meaning specified in Section 14.1(a).

"Authorized Representative" shall mean such person the Authority, the Manager, and the Team, respectively, designate pursuant to Section 2.3.

"Business Day" shall mean any day other than a Saturday, Sunday or legal holiday or a day on which banks located in the State are not open for business.

"Capital Enhancements" shall mean Capital Repairs and Capital Improvements.

"Capital Funding Plan" shall mean the short-term and long-term capital funding plan adopted by the Authority. The short-term portion of the plan shall identify the Capital Enhancements to be performed during the upcoming year and the next succeeding year that, for each such year, (A) identifies the items of Capital Enhancements work proposed to be performed, (B) cost estimates for each item of work proposed, and (C) a timetable for completion of each item of proposed work.

"Capital Improvements" shall mean, other than Capital Repairs, new capital items, features, components and other elements of the Stadium and Stadium Infrastructure not included in the construction of the Stadium and Stadium Infrastructure (as the same are constructed in accordance with the Development Agreement Documents) and any associated capital repairs and replacements of such new capital items, features, components and other elements.

"Capital Repairs" shall mean capital repairs, replacements and improvements of any kind or nature to any item, feature, component or other element of the Stadium and Stadium Infrastructure included in the construction of the Stadium or Stadium Infrastructure, including all such items, features, components and other elements required by the Development Agreement Documents and existing as of the date of Substantial Completion (as defined in the Use

2

Agreement) (and any item, feature, component or other element that will be completed after the date of Substantial Completion in order that the terms and conditions of the Development Agreement Documents are satisfied).

"City" shall mean the City of Minneapolis, Minnesota.

"Civic and Non-Profit Events" shall mean civic and community events and activities, including, but not limited to, athletic, educational and cultural events and activities in the Stadium Site and the Urban Park coordinated through the Authority's designated liaison for Civic and Non-Profit Events.

"Concession Agreement" shall mean that certain Concession Agreement to be entered into by and between the Authority and the Concessionaire.

"Concessionaire" shall mean the entity selected by the Authority to provide concession services at the Stadium Site.

"Confidential Information" shall have the meaning specified in Section 8.2.

"Construction Manager" shall mean M.A. Mortenson Company or another entity selected by the Authority to provide construction management services for the Stadium and Stadium Infrastructure.

"Consulting Services" shall have the meaning specified in Section 4.2.

"Corrective Action Plan" shall mean a plan that the Authority requires the Manager to prepare and deliver to the Authority (for approval by the Authority) within fifteen (15) days of notice from the Authority to the Manager of a failure to meet or satisfy a scoring criteria applicable to any Qualitative Performance Measure.

"DBE" shall mean disadvantaged business entity.

"Development Agreement" shall mean that certain Second Amended and Restated Development Agreement between the Authority and the Team dated as of August 22, 2014, as the same may be further amended, restated, replaced or assigned from time to time.

"Development Agreement Documents" shall mean the certain agreements as defined in the Development Agreement.

"DTE Development Agreement" shall mean the certain development agreement by and among the City, Ryan Companies U.S., Inc. and the Authority, dated as of February 10, 2014.

"EAF" shall have the meaning specified in Section 5.2(f).

"Effective Date" shall have the meaning specified in the first paragraph of this Agreement.

3

"Event Expenses" shall mean any and all direct or incremental expenses incurred or payments made by the Manager in connection with Events at the Stadium, including but not limited to incremental utility costs, certain broadband communication services, ticketing, costs relating to setup and cleanup, security and crowd control, ushers, ticket takers, other Event related staff, and other Event related expenses. With respect to the Team, Event Expenses shall be interpreted consistently with the Use Agreement.

"Event Marketing Fund" shall have the meaning specified in Section 5.5(d).

"Events" shall mean Team Events and Authority Events.

"Existing Stadium" shall mean the Mall of America Field Hubert H. Humphrey Metrodome located in the City.

"Expected Facility Standard" shall mean the obligation set forth in the Use Agreement to operate and maintain the Stadium and Stadium Infrastructure in a safe, clean, attractive, and first-class manner similar to and consistent with other comparable NFL facilities of similar design and age and in compliance with all Laws.

"FF&E" shall mean furniture, fixtures and equipment.

"Final Report" shall have the meaning specified in Section 4.2(a)(xi).

"First Operating Year" shall mean the first year of operation of the Stadium Site commencing on the Opening Date and continuing for 365 days thereafter.

"First Partial Operating Year" shall mean the period of time commencing on the Opening Date and continuing through December 31, 2016.

"Fiscal Year" shall mean a one-year period, or the portion thereof attributed to the First Partial Operating Year, ending each December 31st.

"Force Majeure" shall have the meaning specified in Section 19.8(a).

"General Manager" shall mean that individual proposed by the Manager and approved by the Authority to be the general manager of the Stadium Site in accordance with Section 5.2.

"Governmental Authority" shall mean any federal, state, county, city, local or other government or political subdivision or any agency, authority, board, bureau, commission, department or instrumentality thereof.

"Interest Rate" shall mean the sum of (i) one percentage point, and (ii) the published prime rate charged by US Bank, National Association, such rate to be adjusted at the end of each calendar quarter. In the absence of US Bank, National Association publishing such rate, the rate shall be the rate of "prime" published in The Wall Street Journal under a heading presently entitled "Money Rates", such rate to be adjusted as the end of each calendar quarter.

"Labor Peace Agreement" shall have the meaning specified in Section 5.2(g)(i).

MSFA000040

"Last Partial Operating Year" shall have the meaning specified in Section 11.3(d).

"Laws" shall have the meaning specified in Section 17.2.

"Losses" shall have the meaning specified in Section 14.1(a).

"Major Contracts" shall mean (i) any telecommunications agreement; (ii) any utility or event utility agreement; (iii) any insurance agreement; (iv) contracts related to Stadium Site security services; and (v) any concession or concession related services agreement.

"Management Services" shall have the meaning specified in Section 5.

"Manager" shall have the meaning specified in the first paragraph of this Agreement.

"Manager Capital Investment" shall mean Two Million Seven Hundred and Fifty Thousand Dollars ($2,750,000) to be provided by the Manager to the Authority in accordance with Section 11.2.

"Manager Indemnitees" shall have the meaning specified in Section 14.1(b).

"Manager Parties" shall have the meaning specified in Section 14.1(a).

"Manager's Offices" shall mean the administrative and operational offices occupied by the Manager in the Stadium as designated by the Authority.

"Minor Capital Equipment" shall mean any and all FF&E, machinery or equipment, either additional or replacement, having a per item original cost up to Five Thousand Dollars ($5,000), inflating with CPI annually commencing on the Opening Date, or has a useful life of three (3) years or less.

"MLS" shall mean Major League Soccer.

"National Football League Club(s)" means any National Football League member club that is entitled to the benefits, and bound by the terms, of the National Football League constitution.

"NFL" or "National Football League" shall mean, collectively, the Office of the National Football League Commissioner, the National Football League Commissioner, the National Football League Clubs, the NFL owners, and/or any other Person appointed by any of the foregoing, or any successor substitute association or entity of which the Team is a member or joint owner and which engages in professional football in a manner comparable to the National Football League.

"NFL Rules" shall mean the NFL's Constitution, By-Laws, rules, regulations, Game Operations Manual, policies, specifications, mandates and agreements, in each case as amended and in effect from time to time and any interpretation of any of the foregoing issued from time to time by the NFL Commissioner.

MSFA000041

"NOI" shall mean with respect to the First Partial Operating Year and each Operating Year, the Operating Revenues less Operating Expenses for such First Partial Operating Year or each Operating Year, as applicable; provided, however that such calculation of NOI for the First Partial Operating Year or any applicable Operating Year shall not include (i) any extraordinary, non-reimbursable Operating Expenses as the result of hosting a large-scale, special event (e.g. the Super Bowl or NCAA Final Four) (ii) any expenses incurred for areas not within the Stadium Site regarding municipal services in connection with Events held at the Stadium Site, (iii) any payments to the State for the use of the Stadium Site by an MLS franchise, (iv) payment by the State to the Authority of captured increases in taxes pursuant to Section 297A.994, Subd. 4, clause 5 of the Act, (v) the payment by the State in accordance with Section 473J.13, Subd. 4(c), (vi) the Capital Cost Payment (as defined in the Use Agreement), and (vii) payments for the Capital Reserve Fund and utility services as set forth in the Concessionaire Agreement.

"NOI Benchmarks" shall have the meaning specified in Section 11.3(b)(iv).

"NOI Calculation Report" shall have the meaning specified in Section 11.3(e).

"NOI Guarantee" shall have the meaning specified in Section 11.3(a).

"NOI Shortfall" shall mean the amount that NOI falls below the NOI Guarantee in the First Partial Operating Year or any subsequent Operating Year.

"Net Operating Income/Loss" shall mean with respect to a Fiscal Year, the excess, if any, of Operating Revenues for such Fiscal Year in excess of Operating Expenses for such Fiscal Year, in the case of a profit, and the excess, if any, of Operating Expenses for such Fiscal Year in excess of Operating Revenues for such Fiscal Year, in the case of a loss.

"Net Operating Income/Loss Goal" shall have the meaning specified in Section 12.2(a).

"Opening Date" shall mean that date when the first Event is held at the Stadium during which the Manager provides services pursuant to this Agreement.

"Operating Budget" shall mean the annual budget for the operation and maintenance of the Stadium Site.

"Operating Expenses" shall mean, subject to the exclusions and exceptions set forth herein, reasonable and necessary expenses and expenditures of whatever kind or nature incurred, directly or indirectly, by the Manager in promoting, operating, maintaining and managing the Stadium Site and Urban Park, including, but not limited to:

(a)     employee compensation, employee benefits and other fringe benefits as approved by the Authority;

(b)     contract labor, supplies, material and parts costs, costs of any independent contractors;

(c)     advertising, marketing, memberships, subscriptions and dues, group sales, and public relations costs and commissions;

MSFA000042

(d)    janitorial and cleaning expenses;

(e)    data processing costs;

(f)    costs of procuring and maintaining insurance, (excluding the fidelity bond, the crime bond, and the surety bond);

(g)    amounts expended to procure and maintain permits and licenses, charges, taxes, fees, professional fees;

(h)    Event Expenses;

(i)    printing, stationary, postage and freight costs;

(j)    equipment rental costs, computer equipment leases, document management system costs, electronic security fees, telecommunications network charges, satellite and cable charges, web-site hosting and content management costs, repairs and maintenance costs, software licensing and training costs;

(k)    security expenses;

(l)    utility (electric, water, chilled water, gas, and sewer services) charges;

(m)    employee uniforms;

(n)    safety and medical expenses;

(o)    pest control, exterminator and waste disposal costs;

(p)    costs relating to the maintenance, repair and upkeep of the Stadium Site and its Systems and equipment (including expenditures on Minor Capital Equipment but not including other Capital Enhancements unless such costs do not extend the useful life of the item being maintained, repaired or up kept by more than fifty percent (50%) of such item's original useful life);

(q)    cost of compliance with Laws;

(r)    audit, accounting and legal fees;

(s)    costs of screening, testing and credit checks of the Manager's employees working at the Stadium Site pursuant to the terms of this Agreement, the Manager's policies, as required by law or at the request of the Authority;

(t)    commissions and other fees payable to third parties (e.g. commissions relating to food and beverage and merchandise concession services), if applicable;

(u)    costs incurred under agreements, commitments, licenses and contracts executed in the Manager's name in accordance with the terms of this Agreement and in furtherance of Management Services provided hereunder;

7

(v)     costs incurred with any customer satisfaction survey conducted by the Manager at the request of the Authority pursuant to Section 5.12;

(w)     bank service charges, if any, on accounts established pursuant to Section 12.6; and

(x)     any other expenses incurred by the Authority pursuant to the Use Agreement or for Authority Events,

all as determined in accordance with generally accepted accounting principles and recognized on a full accrual basis; *provided, however,* Operating Expenses shall not include the following: (i) expenses or expenditures in connection with Capital Enhancements consistent with subsection (p) above; (ii) costs and expenses incurred by the Authority, including property taxes (if any); (iii) any expenses relating to the Manager personnel based in the Manager's corporate headquarters in West Conshohocken, Pennsylvania or other locations (unless specifically set forth in the Operating Budget); (iv) the cost of the fidelity bond, the crime bond, and the surety bond; (v) any Losses for which the Authority Indemnitees have a right to be indemnified for pursuant to the terms of Section 14.1(a), provided that if such right to indemnification is disputed by the Manager, such Losses shall be Operating Expenses until such time as such dispute is resolved under Section 19.4; (vi) any suit, action or proceeding filed or instituted against the Authority by the Manager; (vii) the Manager's general home office overhead and capital expenses not directly and primarily related to the Stadium Site; (viii) costs incurred due to the negligence of the Manager, its employees, Affiliates or those of its agents engaged to assist in the performance of the Consulting Services and Management Services provided for herein; (ix) any income taxes which are owed by the Manager; and (x) any taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, service, excise and property taxes which are not directly related to the operation of the Stadium Site which are owed by the Manager.

"Operating Plan" shall have the meaning specified in Section 12.1.

"Operating Revenues" shall mean, subject to the exclusions and exceptions set forth herein, any and all revenues of every kind or nature received or collected from operating, managing, promoting or participating in any other activity associated with the Stadium Site and Urban Park and accruing solely to the benefit of the Authority, including, but not limited to:

(a)     the Operating Cost Payment (as defined in the Use Agreement) by the Team in the amount of Eight Million Five Hundred Thousand Dollars ($8,500,000) adjusted for inflation annually in accordance with the Use Agreement and the Act;

(b)     the payment by the State in accordance with Section 473J.13, Subd. 2(b) in the amount of Six Million Dollars ($6,000,000) adjusted for inflation annually in accordance with the Act;

(c)     a Two Dollar ($2.00) per ticket facility fee applied to certain Authority Events held at the Stadium Site with the approval of the Authority;

(d)     rental income, use fees, and licenses;

8

(e)    box office revenues, ticket company rebates, group sales commissions;

(f)    advertising commissions for in house services to users/promoters;

(g)    mark-ups on expenses reimbursed by users/promoters;

(h)    any percentage of Gross Revenues (as defined in the Concession Agreement) paid by the Concessionaire to the Authority pursuant to the Use Agreement and Concession Agreement;

(i)    revenues from merchandise and novelty sales after taxes, artist's or show's commission and labor costs, other than revenues from merchandise and novelty sales owned, operated and managed by the Team;

(j)    conversion or change over fees;

(k)    utility surcharges;

(l)    corporate Event sponsorships received by the Authority;

(m)    revenue from non-exclusive signage and advertising received by the Authority;

(n)    equipment rentals;

(o)    day of Event premium seat sales, including suites, club seats, party suites and other premium locations;

(p)    miscellaneous operating revenue;

(q)    revenues from the sale of tickets for Events at the Stadium Site; and

(r)    any other revenues received by the Authority pursuant to the Use Agreement,

all as determined in accordance with generally accepted accounting principles and recognized on a full accrual basis. For the sake of clarity, the Parties acknowledge that revenues from the sale of tickets for Events at the Stadium Site that do not accrue to the benefit of the Authority are not Operating Revenues of the Authority whether or not the Manager collects such revenues from ticket sales on behalf of the City, the Team, or the promoter and/or performer, as the case may be.

"Operating Year" shall have the meaning specified in Section 11.3(a).

"Operations Manual" shall have the meaning specified in Section 5.1(b).

"Parking Agreement" shall mean that certain Parking Agreement, dated as of February 10, 2014, by and between the Authority, the City and Ryan Companies US, Inc.

9

regarding certain parking structures within the Stadium Infrastructure, as the same may be amended, modified, supplemented or replaced from time to time.

"Party" or "Parties" shall have the meaning in the first paragraph of this Agreement.

"Person" shall mean any natural person, sole proprietorship, corporation, partnership, trust, limited liability company, limited liability association, unincorporated association, joint venture, joint-stock company, Governmental Authority, or any other entity or organization.

"Plaza" shall mean the open air portion of the Stadium Infrastructure immediately adjacent to the Stadium and included in the Stadium Site.

"Preliminary Report" shall have the meaning specified in Section 4.2(a)(xi) of this Agreement.

"Pre-Opening Consulting Budget" shall have the meaning specified in Section 4.4(a).

"Pre-Opening Fund" shall have the meaning specified in Section 4.4(b).

"Pre-Opening Funding Date" shall have the meaning specified in Section 4.4(b).

"Pre-Opening Period" shall mean the period of time commencing with the Effective Date and ending on the Opening Date.

"Qualitative Performance Measures" shall have the meaning specified in Exhibit B.

"Quality Operating Standard" shall have the meaning specified in Section 3.1.

"Renewal Term" shall have the meaning specified in Section 10.

"RMCP" shall have the meaning specified in Section 13.3(b).

"Sixth Anniversary" shall have the meaning specified in Section 18.2(a).

"Stadium" shall have the meaning specified in Recital A.

"Stadium Site Marketing Plan" shall have the meaning specified in Section 5.5(b).

"Stadium Infrastructure" shall mean the Plaza, parking structures, rights-of-way, connectors, skyways and tunnels, and all other property, facilities, and improvements, owned by the Authority or determined by the Authority to facilitate the use and operation of the Stadium.

"Stadium Site" shall mean the Stadium and the Stadium Infrastructure and the real property, rights, easements, and access areas associated with the Final Site Plan (as defined in the Use Agreement).

"Staff Phase-In Schedule" shall mean the Pre-Opening Period staffing plan, which shall include hiring as employees certain individuals designated by of the Authority, submitted by the

Manager and approved by the Authority and incorporated into the Pre-Opening Consulting Budget.

"State" shall mean the State of Minnesota.

"Systems" shall mean all systems, equipment and components necessary for the operation of the Stadium Site, including, without limitation, computer hardware, software, peripherals, technology products, operational systems, telephone systems, HVAC systems, elevator and escalator systems, security systems, the retractable roof and the retractable field and all other automated systems and equipment, and all components of any of the foregoing.

"Team" shall mean, collectively, Minnesota Vikings Football Stadium, LLC, as a party to the Use Agreement, and Minnesota Vikings Football, LLC as a party to that certain Football Playing Agreement between the Team and the Authority dated October 3, 2013.

"Team Events" shall have the meaning specified in the Use Agreement.

"Team Games" shall have the meaning specified in the Use Agreement.

"Term" shall have the meaning specified in Section 10 of this Agreement.

"Ticket Revenue Account" shall have the meaning specified in Section 12.9.

"Unavailability Period" shall mean that the Stadium Site or Urban Park is unavailable for a period of time in excess of seventy-five (75) consecutive days for hosting Authority Events due to (i) a restriction on usage imposed in connection with hosting a large-scale, special event (e.g. national political convention) or (ii) untenantability of significant portions of the Stadium Site or Urban Park.

"Urban Park" shall mean the real property legally described in the Urban Park Use Agreement.

"Urban Park Marketing Plan" shall have the meaning specified in Section 5.5(c).

"Urban Park Use Agreement" shall mean that certain agreement effective the tenth (10th) day of February, 2014, by Ryan Companies, US, Inc. and the Authority regarding the Urban Park.

"Use Agreement" shall mean that certain Amended and Restated Stadium Use Agreement entered into by and between the Authority and the Team with an effective date of November 22, 2013, as amended from time-to-time.

## 2.    **Engagement of the Manager**.

2.1    Engagement.

(a)    General Scope of the Manager.    The Authority hereby engages the Manager to manage, operate, maintain and market the Stadium Site and Urban Park as an

11

independent contractor of the Authority with respect to the day-to-day operations of the Stadium Site during the Term and any Renewal Term all upon the terms and conditions hereinafter set forth and under the direction of the Authority, and the Manager hereby accepts such engagement. During the Term and any Renewal Term the Manager will also manage certain activities related to the Stadium Site, including events at the Urban Park in accordance with the Urban Park Use Agreement on behalf of the Authority.

        (b)    Manager of the Stadium Site. The Manager shall be responsible for the day-to-day operation of the Stadium Site and all activities therein; provided that the Manager shall follow all policies and guidelines of the Authority established or modified by the Authority that are applicable to the Stadium Site.

        (c)    Manager of the Urban Park. The Manager shall be responsible for the operation of the Urban Park and all activities therein as granted to the Authority under the Urban Park Use Agreement; provided that the Manager shall follow all policies and guidelines of the Authority established or modified by the Authority that are applicable to the Urban Park.

        2.2    Nature of Relationship. The Parties agree that the only relationship created by this Agreement between the Authority and the Manager is that of an independent contractor for the Consulting Services and Management Services provided pursuant to the terms and conditions of this Agreement. The Manager is not an agent, employee, joint venturer or partner of the Authority.

        2.3    Appointment of Authorized Representatives. The Authority hereby appoints its Executive Director/CEO, the Manager hereby appoints its General Manager, and the Team has appointed its Chief Financial Officer, each to act as a liaison and contact person between that party and the Manager in matters concerning the administration of this Agreement (each an "Authorized Representative"). Each Party shall have the right to designate a new or substitute Authorized Representative by providing written notice to the other Party. If the Manager desires to engage in or do any act hereunder which requires the Authority's approval, such request shall be submitted in writing to the Authority's Authorized Representative. Each Party may rely and shall be fully protected in relying upon the authority of the other Party's Authorized Representative to act for and bind such Party in any matter governed by this Agreement. Whenever the term "Authority" is used in this Agreement the Authority's Authorized Representative may act on behalf of the Authority, unless the Authority's governing body otherwise designates or unless otherwise required by the Act.

**3.    Standard of Service**.

        3.1    Standard. The Manager shall manage and operate the Stadium Site consistent with the Use Agreement and the Urban Park consistent with the Urban Park Use Agreement so as to (a) maintain and operate the Stadium Site as a first class multi-purpose sports, public assembly, exhibit, entertainment, concert, convention and trade show facility, and as further specified in the Operations Manual (the "Quality Operating Standard") and to a standard of quality that meets or exceeds the Expected Facility Standard; (b) maximize Operating Revenues while minimizing Operating Expenses; (c) maximize the number of Events and attendance at Events at the Stadium Site and Urban Park; (d) minimize the legal liability and exposure of the

Authority to the greatest extent possible; (e) enhance the quality of experience for all patrons attending Events at the Stadium Site and Urban Park; (f) maximize the positive economic impact and employment opportunities from the Stadium Site and Urban Park to the Authority, the State, the City and the citizens of the State; and (g) make the Stadium Site and Urban Park an attractive venue(s) to promote and book a wide variety of Events. The Manager acknowledges and agrees that the Team has the right to consult with the Authority and the Manager with respect to Stadium Site operations impacting the Team or Team Stadium Events, including with respect to Authority or Manager staff training and operating practices.

3.2     Compliance with Other Agreements; No Amendments.     Nothing in this Agreement is intended to or shall modify or amend the Use Agreement, the Development Agreement, the Urban Park Use Agreement, the Parking Agreement, any subsequent use agreement to be entered into by the Authority with any third party, or other agreements entered into by the Authority. With respect to the Manager's performance of its services under this Agreement, the Manager shall comply with all provisions that the Authority is subject to pursuant to the Use Agreement, the Development Agreement, the Urban Park Use Agreement, the Parking Agreement, subsequent use agreement entered into by the Authority, or other agreements entered into by the Authority and all limitations on the Authority in the Use Agreement, the Development Agreement, the Urban Park Use Agreement, the Parking Agreement, any subsequent use agreement entered into by the Authority, or other agreements entered into by the Authority shall be limitations on the Manager. In the event any of the Use Agreements, the Development Agreement, the Urban Park Use Agreement the Parking Agreement, any subsequent use agreement entered into by the authority, or other agreements entered into by the Authority are entered into, amended or supplemented after the Effective Date with terms that materially impact the rights and benefits granted to the Manager under this Agreement, the Parties shall mutually negotiate an accommodation or amendment to this Agreement so that the Manager enjoys, to the extent possible, the rights and benefits granted to the Manager on the Effective Date.

3.3     Limitation on the Manager's Duties.     The Manager shall owe to the Authority a duty to perform its obligations under this Agreement and to conduct the management and operation of the Stadium Site and Urban Park at all times with integrity and good faith and in a manner which in the good faith judgment of the Manager is in the best interest of the Stadium Site and Urban Park and the Authority and consistent with the terms of this Agreement. The Manager's obligations to perform its duties in accordance with the standards set forth in Sections 3.1 and 3.2 are contingent upon and subject to the Authority making available, in a timely fashion, the funds set forth in the Approved Budget. The Manager shall not be considered to be in breach or default of this Agreement, and shall have no liability to the Authority or any other party, in the event the Manager does not perform its duties in accordance with such standards in Sections 3.1 and 3.2 due to failure of the Authority to timely provide such funds set forth in the Approved Budget.

3.4     Adjustments for Certain Modifications to the Stadium Site or Urban Park.   In the event that the Authority modifies the Stadium Site or Urban Park to include or exclude properties or structures not contemplated by the Parties as of the Effective Date, and the inclusion or exclusion of such additional properties or structures is (i) demonstrated by the Manager to have a material financial impact to the Manager under this Agreement, the Parties shall mutually

13

negotiate an accommodation or amendment to this Agreement for addressing the material financial impact or (ii) demonstrated by the Authority to have a material financial impact to the Authority under this Agreement, the Parties shall mutually negotiate an accommodation or amendment to this Agreement for addressing the material impact.

4.    **Pre-Opening Services**.

4.1    General. The Manager shall be responsible for assisting the Authority in the strategic planning, project development, and management services during the Pre-Opening Period. The Manager shall oversee pre-opening services related to the Stadium Site and Urban Park marketing, promoting, booking and operations and shall provide a pre-opening review of the Stadium and Stadium Infrastructure design and construction subject to the terms and conditions of the Development Agreement and the Urban Park subject to the terms and conditions of the DTE Development Agreement. The Manager shall coordinate all services provided by the Manager with regard to the strategic planning, project development, and management services provided during the Pre-Opening Period with the Authority and the Authority's Authorized Representative.

4.2    Consulting Services. Without limiting the foregoing, the Manager shall provide the following services as directed by the Authority during the Pre-Opening Period: (a) the pre-opening review of Stadium Site and Urban Park design and construction, (b) the pre-opening project coordination, (c) the pre-opening operational consulting, (d) the pre-opening venue marketing, and (e) the grand opening support services (collectively, the "Consulting Services"):

(a)    Pre-Opening Review of Stadium Site and Urban Park Design and Construction. The Manager shall perform the following pre-opening consulting services related to the review of the Stadium Site and Urban Park design and construction in coordination with the Authority:

(i)    Designate an employee who will serve as senior design development and construction consulting executive for the Manager, through whom all communications among the Manager, the Authority and agents of the Authority relating to the consulting responsibilities referred to in this Section 4.2 will be circulated.

(ii)    Participate in consultations with the Authority in order to advise the Authority as to whether the design compromises the quality of programming of Events at the Stadium Site or potentially increase operating and maintenance costs of the Stadium or Stadium Infrastructure.

(iii)    Cooperate with the Authority in the review of drawings and submittals, where appropriate, identifying operational concerns and conflicts with the operations and functioning of the Stadium Site.

(iv)    Review the hardware schedules for the Stadium Site and make recommendations for a keying plan to be utilized, emphasizing the development of a long-term focus of promoting building security and safety needs.

14

(v)     Review the interior finish schedule and plan for the Stadium Site, and provide comments and recommendations, emphasizing the need for cost-effective, durable and low-maintenance surfaces, floors, equipment and materials.

(vi)     Review the graphics and signage package in and around the Stadium Site to ensure that the package meets the needs of the anticipated Event schedule and related vehicle-patron traffic patterns; assist the graphic designers in the selection of interior graphics, communication needs and vocational plans.

(vii)     Review the plan for voice, data, radio, video, or multimedia network services (including any associated features or functions associated with any of the foregoing), electronic security services, audio and video conferencing services, Internet access services, and other similar communication technology services and the implementation for such services;

(viii)   Review the ticketing manifest and plan;

(ix)     Review design assumptions and performance parameters.

(x)      Compare design to comparable facilities to help meet or surpass advantages of prime competitor facilities.

(xi)     A plan design review team consisting of the Manager's operations executives (representing various disciplines from within the Manager's organization) will provide ongoing review of the following components of the overall Stadium Site, including the Stadium design, Stadium Infrastructure design, and the Urban Park as applicable, and will make recommendations to the Authority and its other consultants, agents and representatives with respect to the design and construction documents.     The Manager shall provide its recommendations on the design and construction documents on an ongoing basis.  Upon the request of the Authority, the Manager will provide a comprehensive written report of the Manager's recommendations on the design and construction documents within thirty (30) days following such request by the Authority (the "Preliminary Report") and a final written report to be delivered to the Authority within ninety (90) days following delivery of the Preliminary Report (the "Final Report").  The plan design review, the Preliminary Report and the Final Report will include, but not be limited to, analyzing the design and construction plans in consideration of the following aspects:

(1)     Show promoter's requirements;

(2)     Local community requirements;

(3)     Patron services, amenities and flow;

(4)     Parking, bus pick up and drop off, and traffic management and parking automation;

(5)     Loading dock functionality;

15

(6)    Physical and electronic security;

(7)    Information   and   building   management   technology requirements;

(8)    Event staging/set-up requirements;

(9)    Storage;

(10)    Utility consumption and control;

(11)    Revenue opportunities (including signage, food and beverage, merchandising, advertising and content delivery fees);

(12)    Operational   efficiencies   with   regard   to   storage, housekeeping, maintenance, and traffic flow, especially show move- in and move-out access;

(13)    Applicable codes, especially as they relate to user requirements and the maintenance of necessary aisle ways and routs of passage as they affect capacity and public safety;

(14)    Communications   systems   and   Stadium   connectivity services;

(15)    Alarm systems;

(16)    Americans with Disability Act compliance;

(17)    Medical and first aid services;

(18)    Staffing levels and impact on design elements;

(19)    Television and other media broadcasting and Stadium connectivity services; and

(20)    Location of automated teller machines.

(xii)    Review and comment on reports and studies provided by the Authority's other consultants which are required for the design of the project and which affect operations including any acoustical studies, vertical transportation studies and other related studies or reports.

(xiii)    Review and comment on (1) comprehensive FF&E list for the operational spaces at the event level in the Stadium and Stadium Infrastructure (other than those areas occupied by the Concessionaire and the Team, if any), (2) FF&E budget and assist the Authority with budget alignment based on the proposed FF&E inventory, and the administrative and executive offices of the Manager and the Authority located in the Stadium or Stadium Infrastructure.

MSFA000052

(xiv)   Attend progress meetings with the Authority.

(xv)   Observe the construction progress with scheduled Stadium Site visits with the Authority's Authorized Representative.

(xvi)   Review Construction Manager correspondence as provided.

(xvii)   Advise the Authority on the acceptance of structure and substantial completion.

(xviii)   Contribute to and monitor the Construction Manager's completion of punch list items.

(xix)   Review completion report with the Authority, including full set of as-built drawings.

(xx)   Coordinate transition from construction project to an operating Stadium Site and Urban Park.

(b)   Pre-Opening Project Coordination Consulting.   The Manager shall develop, in coordination with the Authority, operational projections for the Stadium Site and Urban Park, including but not limited to:

(i)   Projected Events, numbers of performances, average attendance and other relevant Event-related information,

(ii)   Projected revenues,

(iii)   Staff organizational chart, job descriptions, salaries, and benefits, and hiring timeline,

(iv)   Critical path analysis and timeline, and

(v)   Detailed Operating Revenue and Operating Expense projections.

If requested, assist the Authority in providing specifications of the FF&E bid process, including bidding and delivery schedules for the FF&E to be provided or located within the Stadium Site and the administrative and executive offices of the Manager and the Authority located in the Stadium.

(c)   Pre-Opening Operational Consulting.   The Manager shall perform, in coordination with the Authority, the following consulting services related to pre-opening operational start-up of the Stadium Site and Urban Park:

(i)   Prepare the Pre-Opening Consulting Budget in accordance with Section 4.4.

17

MSFA000053

(ii)     As soon as reasonably practicable, but no later than July 1, 2015, develop user policies, all subject to the prior approval of the Authority, including but not limited to the following:

(1)     Booking and scheduling,

(2)     Rental rates and service fees, including any box office and non-exclusive signage rates,

(3)     Show Producer's Guide,

(4)     User rental contract,

(5)     Service contracts (facility reconfiguration, electrical, telecommunications, catering, security, decorating, etc.), and

(6)     House policies (rules and regulations of usage).

(iii)    Develop a staffing plan, including job descriptions, and identify the full-time and part-time staff for the Stadium Site.

(iv)    Develop personnel policies.

(v)     Establish charts of accounts and total accounting system including but not limited to the following:

(1)     Cash,

(2)     Operating Revenue,

(3)     Operating Expense,

(4)     Inventory,

(5)     Capital assets,

(6)     Payroll processing,

(7)     Accounts receivable,

(8)     Accounts payable,

(9)     Bank accounts,

(10)    Report functions, and

(11)    Box office.

18

MSFA000054

(vi) Develop programs, systems, methods of electronic document management, digital reporting and data storage systems. Any data and electronic information must be easily transferable into an immediately actionable electronic format upon demand for unencumbered Authority use upon completion or termination of this Agreement. Programs, systems and methods must support the secure partitioning of Authority data and electronic information in a segregated environment managed by designated Authority data center hosting contractor. The Parties acknowledge and agree that the preceding sentence does not preclude the Manager's ability to utilize a third party off-site data center environment for data processing and storage for the purpose of supporting its operations. In addition, develop operating procedures in connection with the financial, operational and facilities management, including but not limited to the following:

(1) Pre-opening expense budget,

(2) Anticipated operating expenses,

(3) Annual budget development,

(4) Risk management efficiencies,

(5) Box office procedures, and

(6) Capital expenditure planning.

(vii) Develop programs, standard operating procedures and initiatives with respect to venue operations, including but not limited to the following:

(1) Building commissioning and event reconfiguration,

(2) Cost benchmarking,

(3) Guest service training,

(4) Asset managing planning,

(5) Energy management. and

(6) Emergency and crisis planning.

(viii) Conduct planning and integration in connection with information and building management technology services inclusive of all major systems architecture, networking, wired and wireless telecommunications, including but not limited to the following:

(1) Performing discovery and information gathering analysis prior to on-site technology review,

(2) Reviewing design and agreements for utility, telecommunications, audio and video connectivity to the Urban Park and Plaza,

19

(3)  Review design specifications and drawings for compatibility and provide analysis based on such review,

(4)  Review proposed DAS/WiFi infrastructure and systems, including alignment with current and future Metropolitan Council and City of Minneapolis/USIW WiFi systems and coverage,

(5)  Development of a list of all core tenant and contract users supported by such information and building management technology, including development of an organization chart in connection therewith,

(6)  Coordinate development of other technology needs, including core, contract and visitor voice/data connectivity, building way finding, concession integration, Authority merchandising, end user content and applications, maintenance agreements, warranties, and vendor contracts, and

(7)  Review and verify network connectivity and bandwidth per visioning from any core infrastructure located outside the Stadium Site.

(ix)  Determine necessary computer hardware and software required, including document management systems.

(x)  Customize an Operations Manual for the Stadium Site, including all Systems and technologies.

(xi)  Develop comprehensive security plans and emergency procedures (terrorism, fire, bomb threat, hazardous materials, flood, etc.), including development of event security plans for Events including the NFL, other football, baseball, soccer and other ticketed sporting events, youth sports, concerts, events in club spaces, not-for-profit events, Plaza events and Urban Park events, among others.

(xii)  Establish preventative maintenance systems, processes and accurate real time connection documentation for all Systems, mechanical and electrical equipment, IP devices, and procurement of state of the art software programs for maintenance, management and documentation.

(xiii)  Acquire necessary permits.

(xiv)  Review and comment on the food and beverage service plan and manage the Concessionaire, including but not limited to the following:

(1)  Concession stands,

(2)  Catering facilities,

(3)  Layout, location, number and design of portable concession outlets,

20

(4)     Support and preparation areas,

(5)     Smallwares, and

(6)     FF&E.

(xv)     Review vendor and supplier lists for overlap or partnership with other Manager operated facilities.

(xvi)     Establish a review of risk management and insurance programs, including insurance and indemnification requirements, environmental issues, employee safety, among other areas and develop master insurance program recommendations (coverage review shall include, without limitation, general and automobile liability, umbrella/excess liability workers compensation and employers liability, property cargo, boiler and machinery, terrorism, pollution liability, tenant lease legal liability, and fidelity, directors and officers, pension trust and bonds).

(d)     Pre-Opening Venue Marketing Consulting. The Manager shall perform, in coordination with the Authority, the following consulting services related to pre-opening venue marketing of the Stadium Site and Urban Park, as applicable:

(i)     Conduct situational analysis,

(ii)     Based on analysis research, develop marketing plan targeting the national, regional, State and Minneapolis-St. Paul metropolitan area markets,

(iii)     Develop marketing plan for the use of the Stadium Site and Urban Park and present recommended Events to book at the Stadium Site and Urban Park after the Opening Date, subject to the final approval of the Authority,

(iv)     Develop event evaluation pro-forma,

(v)     Develop materials necessary to support the marketing plan,

(vi)     Consult with the Authority to develop and execute marketing and programming initiatives, including:

(1)     Development of the Stadium Site, production guide, Authority merchandise, newsletters, visitor applications, Stadium Site seat guides and maps, and related materials,

(2)     Development of the Stadium website and visitor applications, which shall include, without limitation, information on construction progress, construction photo gallery, venue renderings, facility and event information, way finding, in venue convenience features, Authority merchandising, email database sign up, available space specifications, primary contacts (sales, media, catering, etc.), and employment opportunities,

21

(3)     Establish social media presence (e.g. Facebook, Instagram, and Twitter accounts) with regular postings and develop a media kit and media contact list, and

(4)     Development of a marketing budget,

(vii)     Work with tourism officials, convention and visitors' bureaus, Minneapolis-St. Paul metropolitan area business leaders, and the Team to execute the marketing plan for both profit and Civic and Non-Profit Events, as directed by and coordinated through the Authority,

(viii)     Survey competition,

(ix)     As directed by and as coordinated through the Authority, (A) participate in ongoing community, governmental and media relations, and (B) industry exposure via press releases, speaker's bureau, paid advertising, and direct mail,

(x)     Maintain booking calendar, schedule and Events,

(xi)     Subject to all limitations and exclusions contemplated in this Agreement and Law, the Use Agreement and the Urban Park Use Agreement, negotiate, execute and perform all contracts, use agreements, licenses and other agreements (i) with persons who desire to schedule events, performances or who desire otherwise to use the Stadium Site or the Urban Park or any part thereof or (ii) that otherwise pertain to the use, operations and occupancy of the Stadium Site or the Urban Park or any part thereof,

(xii)     Schedule and promote special Events to round out programming,

(xiii)     Create an in-house advertising and event content delivery capability,

(xiv)     Integrate and maximize use of the Urban Park in connection with the Stadium Site, Stadium Events, and other events based upon the rights of the Authority set forth in the Urban Park License Agreement,

(xv)     Establish policies for use of the Urban Park, including, without limitation, policies regarding removal of temporary structures, restrooms, security, audio/visual presentation systems and concessions,

(e)     Grand Opening Services.  The Manager shall execute and perform, in coordination with the Authority, the following initiatives and services related to the opening of the Stadium Site and Urban Park, as applicable:

(i)     Prepare analysis of industry comparable venue opening initiatives and events and provide recommendation to the Authority regarding same,

(ii)     Conduct trial events and activities to test the operational readiness of the Stadium Site and Urban Park,

22

(iii)     Plan Opening Date events and activities to maximize market impact for maximum public relations value and exposure in the industry, both nationally and locally, and community events,

(iv)     To the extent requested by the Authority, plan and coordinate the dedication opening ceremonies for the Stadium and Stadium Site, and

(v)     Establish events and on-line environments highlighting the opening of the Stadium, Stadium Site and Urban Park in coordination with the Authority, which may include public tours, VIP tours, ribbon cutting ceremonies and inaugural concerts, community and other events.

4.3     Manner of Performing Services.

(a)     Unless otherwise provided for in the Pre-Opening Consulting Budget, it is acknowledged that in rendering the Consulting Services, none of the Manager's personnel will be located full-time at the Stadium; the Manager's personnel will from time to time visit the Stadium Site and participate in meetings with other agents, representatives and consultants of the Authority as necessary or appropriate to perform the Consulting Services. The Parties acknowledge and agree that the Manager will staff the Stadium Site according to the Staff Phase-In Schedule and incorporated into the Pre-Opening Consulting Budget as set forth in Section 4.4.

(b)     The personnel assigned by the Manager to perform the Consulting Services shall be available as necessary to perform the Consulting Services described herein.

4.4     Pre-Opening Consulting Budget.

(a)     The Manager shall submit to the Authority, for the Authority's approval, a pre-opening operating budget (the "Pre-Opening Consulting Budget"), as soon as possible for the expenditures to be approved for payment by the Authority during the Pre-Opening Period. The Parties acknowledge that such Pre-Opening Consulting Budget shall include the reasonable, out-of-pocket travel costs (including the cost of coach class airfare, ground transportation, meals and lodging) incurred by the Manager or its agents or employees in the course of performing the services set forth in Sections 4.2(b), (c) and (d) (but not Section 4.2(a)). The Authority shall review such proposed Pre-Opening Consulting Budget and provide any comments to the Manager as promptly as possible so that the Pre-Opening Consulting Budget can be finalized, approved and funded by the Authority as soon as practical. The Manager shall be entitled from time to time to revise and update such Pre-Opening Consulting Budget to reflect changed circumstances, provided that any changes, amendments or revisions to the Pre-Opening Consulting Budget shall require the prior written approval of the Authority. During the Pre-Opening Period, without the prior written consent of the Authority, the Manager's aggregate expenditures taken as a whole relative to the total Pre-Opening Consulting Budget shall not exceed the aggregate Pre-Opening Consulting Budget. In the event that at any time during the Pre-Opening Period, the Manager reasonably believes that it is likely to exceed the approved Pre-Opening Consulting Budget, the Manager shall promptly give notice to the Authority.

(b)     In order to provide funding for the expenses set forth in the Pre-Opening Consulting Budget, the Authority shall, within thirty (30) days after the approval of the Pre-

MSFA000059

Opening Consulting Budget (the "Pre-Opening Funding Date"), (A) reimburse the Manager for all pre-opening expenses set forth in the Pre-Opening Consulting Budget that have been advanced by the Manager prior to the date thereof and (B) advance to the Manager for deposit in an interest-bearing account established in accordance with Section 12.6 below for withdrawal by the Manager upon incurrence of pre-opening expenses ("Pre-Opening Fund"), an amount equal to the aggregate of the projected Pre-Opening Consulting Budget expenses for the three (3)-month-period beginning on the Pre-Opening Funding Date. By no later than the first (1st) Business Day of each successive three (3)-month-period during the Pre-Opening Period, the Authority shall advance to the Pre-Opening Fund an amount as is necessary to fund the aggregate of projected pre-opening expenses set forth in the Pre-Opening Consulting Budget for the next three (3) month period. If, at the end of the Pre-Opening Period, there is a balance in the Pre-Opening Fund in an amount in excess of the accrued expenses set forth in the Pre-Opening Consulting Budget, the Manager shall transfer such excess amounts to the account established pursuant to Section 12.6 below. If, after the first (1st) Business Day of any month, the amount of moneys on deposit in the Pre-Opening Fund shall be insufficient for the payment of pre-opening expenses set forth in the Pre-Opening Consulting Budget then due or budgeted to become due during such month, the Manager may, but shall not be required to, advance the amount of such insufficiency out of its funds. If the Manager does advance any funds for expenses, the Manager shall immediately notify the Authority of any such advance, and the Authority shall no event later than the tenth (10th) day following the date of such notice, reimburse the Manager in the amount of the advance.

**5.     Management and Operational Services**. Subject to any rights or obligations in the Use Agreement and the Urban Park Use Agreement, the Manager shall be responsible for the management and operations, all in coordination with the Authority, of the Stadium Site and Urban Park and for providing certain services, including but not limited to, the following (collectively, the "Management Services"):

        5.1     General Management and Operation Services.

                (a)     Pre-Opening Services. The Manager shall continue to perform all services and obligations provided under Section 4, unless such services or obligations are not applicable to the ongoing management of the Stadium Site or the Urban Park after the Opening Date.

                (b)     Day-to-Day Services. The Manager shall manage and operate the Stadium Site and Urban Park and any properties or assets ancillary thereto and contract for their use in a manner consistent with the standards set forth in Section 3.1. In general, the Manager shall perform all services and functions as the Authority may reasonably request in order to maintain, operate, market, utilize and improve the Stadium Site and to operate, market and utilize the Urban Park, consistent with the terms of the Urban Park Use Agreement. The Manager shall provide the Authority a draft operations and maintenance manual addressing the day-to-day procedures including without limitation, security, booking policy and marketing plan for Events at the Stadium Site and Urban Park within one hundred twenty (120) days of execution of this Agreement. Based upon comments received from the Authority, the Manager shall provide a revised operations and maintenance manual to the Authority prior to July 1, 2015 (the "Operations Manual"). The Operations Manual shall be subject to the final review and approval of the Authority. Upon such approval by the Authority, the obligations in such Operations

Manual shall become obligations of the Manager pursuant to this Agreement. The Manager may submit to the Authority or the Authority may periodically require the Manager to provide supplements or revisions to the Operations Manual. Upon the written approval of the Authority of such supplements or revisions, the Operations Manual shall be amended to incorporate such supplements or revisions.

### 5.2    Employees and Other Personnel.

(a)    The Manager shall be responsible for hiring, training, supervising and directing its employees and other personnel. The Manager shall use its reasonable best efforts to recruit employees who will be proficient, productive, and courteous to patrons. The Manager agrees to employ the Authority personnel serving in the positions listed on Exhibit A, with compensation and benefits at least comparable to that which the employee currently receives from the Authority, if the employee so chooses. The Authority personnel, currently or most recently, serving in the positions listed on Exhibit A shall be employed by the Manager, absent dismissal for just cause, for a period of at least twelve months after the Opening Date of the Stadium.

(b)    The Manager shall assign to the Stadium Site a competent, full-time General Manager who will serve as Manager's liaison with the Authority's Authorized Representative. The General Manager shall receive directives from, and tender reports to, the Authority on behalf of the Manager in accordance with this Agreement. The Authority shall have the right to approve the selection of the Manager's General Manager. In the event the Manager desires to remove the General Manager for any reason, the Manager shall first notify and discuss with the Authority the reasons for the desired action and the steps the Manager will take to find and recruit a qualified successor General Manager, however, the General Manager's position shall not be changed without the prior approval of the Authority (except when due to death or disability, or where the General Manager has voluntarily left the employ of Manager). In the event of a change that is not pre-approved by the Authority, Manager shall pay to the Authority a management change fee of Two Hundred Fifty Thousand Dollars ($250,000). The Manager shall involve the Authority in the interviewing of any replacement General Manager, which successor shall be subject to the approval of the Authority, as early in the process as reasonably practicable.

(c)    If at any time Authority finds that General Manager or other senior manager is unsatisfactory, and such causes and reasons are reported in writing by Authority to Manager, Manager shall promptly, in any event within ten (10) Business Days, unless specifically extended in writing by Authority, provide a qualified temporary replacement for the General Manager or other senior management position with one who is satisfactory to Authority. If such a temporary replacement is made, Manager shall continuously endeavor to find a permanent replacement for the General Manager or other senior management position within a reasonable time period not to exceed ninety (90) days. At any time General Manager desires to leave his/her position as General Manager at the Stadium Site, Manager's then current General Manager or Manager's senior management will provide to the replacement General Manager such detailed training as necessary and required before changing his/her position.

MSFA000061

(d) The employees at the Stadium Site shall not for any purpose be considered to be employees of the Authority. The Manager shall compensate its own employees and shall be solely responsible for paying its federal, state and local employment taxes and health and welfare benefit plans and other fringe benefits.

(e) The General Manager or an assistant manager (or a Manager management-level employee with comparable supervisory responsibility) shall be available at all functions for which Manager provides Management Services.

(f) The Manager shall comply with all nondiscrimination employment practices in serving the public. The Manager shall not refuse to hire, discharge, refuse to promote or demote, or to discriminate in matters of compensation against, any person otherwise qualified, solely because of race, color, religion, gender, age, national origin, military status, sexual orientation, marital status or physical or mental disability. The Manager will be required to take actions to achieve certain statutory and Authority aspirational objectives regarding workforce and business inclusion. With regard to the Stadium Site and services to be provided for the Stadium Site, the Manager shall make best efforts to employ, or cause to be employed, women and members of minority communities. The demographics of the City are anticipated to transform the racial landscape over the next twenty (20) years. The minority population is anticipated to increase, and the workforce in the City must reflect that of its residents. Recognizing these demographic trends is an important objective of the Authority. The Manager shall undertake measures designed to eliminate any discriminatory barriers in the terms and conditions of employment on the grounds of race, color, religious creed, national origin, age or sex. Such measures shall include, but not be limited to, measures to ensure equal opportunity in the areas of hiring, upgrading, demotion or transfer, recruitment, layoff or termination, rate of compensation and in service or apprenticeship training programs. To ensure that minorities, women and underrepresented communities in the State are adequately employed through opportunities at the Stadium Site, the Authority will develop an employment plan in conjunction with an employment assistance firm ("EAF") as required under the Act. Once Existing Stadium employees are reclaimed, the EAF's employment plan will include conducting job fairs and other recruiting events which will be hosted by a number of local minority based non-profit organizations.

(g) The Manager must implement the policies of the Authority regarding labor peace and workforce continuity. The Manager must include the requirements of these labor peace and workforce continuity policies in all solicitation documents for certain contracted services for the Stadium Site, including requests for proposals and bid specifications. The Manager must further ensure compliance with these important policies by all contractors performing services.

(i) It is the policy of the Authority to minimize the potential for labor-management disputes that might interrupt contracted Stadium Site services or inconvenience the fans. Accordingly, the Authority has a policy of using contractors who are signatory to a collective bargaining agreement or other valid contract that prohibits work stoppages and provides for a streamlined method for resolving labor disputes. As a condition of operating at the Stadium Site, any contractor providing services to the Stadium Site, shall be or become signatory to a collective bargaining agreement or other valid contract ("Labor Peace

26

Agreement") with any labor organization seeking to represent the services employees at the Stadium Site, which must contain provisions prohibiting the labor organization, and in the case of a collective bargaining agreement, all employees covered by the agreement, from engaging in picketing, work stoppages, and other economic interference at the Stadium Site and prohibiting the contractor from locking out employees. The Labor Peace Agreement will provide that all disputes relating to employment conditions or the negotiation thereof shall be submitted to final and binding arbitration. The Labor Peace Agreement must have duration of at least three (3) years from the contractor's commencement of performance of services at the Stadium Site.

(ii) It is the policy of the Authority to promote stability and continuity of the workforce providing services at the Stadium Site. Accordingly, the Manager shall, on behalf of the Authority, offer the same or similar employment at the Stadium Site to all physical plant and grounds maintenance employees and other maintenance or similar public employees who are/or were employed by the Authority at the time of cessation of operations of the Existing Stadium and are not retired. Following substantial completion of the Stadium, any contractor hired to replace another contractor to provide the same or essentially the same Stadium Services shall offer employment to the preceding contractor's employees for at least ninety (90) days following the termination date of the prior contract. During the ninety (90) day calendar period, the succeeding contractor shall retain the right to terminate a retained employee for just cause. If at any time the succeeding contractor determines that fewer employees are required to meet its obligations under its contract to provide services than were required by the preceding contractor, the succeeding contractor shall retain the right to lay off one or more retained employees based on the succeeding contractor's staffing needs. Any such lay off shall be done in consultation and with written approval of the Authority.

(h) Only those employees of the Manager working at the Stadium in accordance with an Approved Budget will be permitted in the Stadium Site during an Event without charge. The Manager will remove any employees observed in the Stadium Site at Events at which they are not working. At no time will the Manager permit the free entrance of any person not a bona fide employee for such Event or Events and no surplus of employees will be permitted for any Event.

(i) The employees of the Manager will be required to comply with all rules and regulations generally applicable to all employees working at the Stadium Site and, with respect to Team Games, any generally applicable NFL Rules.

(j) Drinking alcoholic beverages or the use or narcotic substances on the job will not be tolerated and infractions will bring dismissal and removal from the premises, or such other disciplinary action by the Manager, consistent with the terms of the Manager's employee policy. The Manager will conduct, in accordance with all applicable Laws and the Manager's employee policies: (a) mandatory screening or testing for drugs, alcohol or other substance abuse on all full time employees of the Manager at the Stadium Site and all part time employees of the Manager at the Stadium Site; and (b) pre-employment credit checks on all employees who will handle cash at the Stadium Site.

(k) Pursuant to the terms and conditions of the Use Agreement, the box office for Team Events is to be operated by the Team. The Manager will coordinate with the Team for

27

the provision of box office services for Team Events at the Stadium Site. If at any time the box office is not operated by the Team, then the Manager shall operate the box office and shall coordinate with and accommodate any other licensee in connection with the use and staffing of the box office for Authority Events at the Stadium Site.

(l)     The Manager shall provide the following in both paper and electronic formats to the Authority within one hundred eighty (180) days after the Effective Date:

(i)     A copy of the Manager's employee handbook.

(ii)     A statement identifying the anticipated sources to be used for obtaining non-management labor.

(iii)     The entry- level training programs outline for all customer-contact personnel.

(m)     All non-management level employees of the Manager will be neatly attired in uniforms that properly identify them as employees of the Manager and may include any logo or other trademark of the naming rights sponsor. All uniforms will be subject to prior approval by the Authority.

5.3     <u>Maintenance, Engineering and Custodial Services</u>.     The Manager shall be responsible for providing maintenance, upkeep and custodial services for the Stadium Site. The Manager shall utilize any vendors, subcontractors and service providers selected in accordance with Section 9 or to fulfill the Authority's obligations to the Team pursuant to the Use Agreement. Maintenance and custodial services shall be performed consistent with contractor, manufacturer, and the Authority's recommendations and requirements. The Manager shall use state of the art computerized maintenance management systems for scheduling maintenance throughout the building, reporting on actual work performed, and preparing cost estimates that will be incorporated into the annual Operating Budget. The Manager shall take no action that will impair, compromise or nullify any warranty. The maintenance and custodial services include, but are not limited to the following:

(a)     <u>General Maintenance, Repair and Upkeep</u>. The Manager shall maintain the Stadium Site in a clean, safe and attractive state, including, but not limited to the surrounding pedestrian plaza, suites, club seats, club lounge area, locker rooms, press box, telephone and data lines, offices, concourse, balcony, ramps, seating area in the stands, tunnels, loading docks, rest rooms and open areas. A clean and attractive state includes replacing bulbs and ballasts in lamps and lighting fixtures; cleaning, repairing and replacing signs; maintaining fire alarm call boxes, fire extinguishers and hose boxes and systems in proper working condition; general Stadium Site maintenance and repairs by tradesmen as required to ensure a clean, attractive and safe environment such as maintenance and repairs of electrical equipment, plumbing fixtures; painting pedestrian areas, offices, rest rooms, etc., other repairs as directed by the Authority; supplying rest rooms with soap, towels, toilet paper and providing for their disposal. The Manager will specifically maintain the flags expected to be outside the Stadium as directed by the Authority.

(b)     Garbage Removal, Recycling and Event Cleaning. The Manager shall arrange for the storage, removal and disposal of all waste material, which shall include coordinating the collection and use of recyclable products, in connection with the Stadium Site. The Manager will ensure that normal rates will apply to such services for nights, weekends, holidays or non-traditional business hours. The Manager shall also be responsible for all storage and disposal of all waste materials throughout the entire Stadium Site on days in which an Event occurs prior to and after such Event. The Manager will closely supervise any third-party providing such services to ensure they understand anticipated attendance, key areas to be cleaned and the schedule for completion of the services. The Manager shall comply with all applicable ordinances, statutes and regulations for storage, removal and disposal of waste materials.

(c)     Pest Control. The Manager shall maintain a pest control program that minimizes the infestation of pests and vermin in accordance with all applicable ordinances, statutes and regulations. Such pest control program shall include weekly reports describing the amount of equipment, bait and personnel deployed to ensure quality control and the Authority will approve the type of equipment and bait used in connection with such pest control program.

(d)     Graffiti Removal. The Manager shall remove or cause to be removed all graffiti applied to surfaces of the Stadium Site. The Authority will approve the chemicals and process to remove the graffiti.

(e)     Elevator/Escalator Maintenance and Repair. The Manager shall maintain in good working order all elevators and escalators, where existing and promptly repair the elevators and escalators when necessary. The Manager shall keep elevators and escalators in good working order and in compliance with applicable codes. The Manager shall cause preventative maintenance on all equipment to be undertaken in accordance with a predetermined schedule approved by the Authority. The Manager shall also have on-site personnel present during all Events to ensure proper elevator and escalator service.

(f)     Maintenance and Custodial Equipment. The Manager shall keep all maintenance and custodial equipment in good repair and working order.

(g)     Maintenance of Electronic Security, Surveillance Equipment and Content Storage. The Manager shall conduct all necessary maintenance of all electronic security and surveillance equipment to maintain such equipment in good repair and working order and maintain copies of all stored media in accordance with approved storage timeframes.

(h)     Maintenance of Scoreboard, Sound System and Video Boards. The Manager shall conduct all necessary maintenance of the video control room, the scoreboard, sound system, video boards, and video production equipment at the Stadium Site to maintain such equipment in good repair and working order, all consistent with the terms of the Use Agreement.

(i)     Roof System, Operable Doors, Curtain Walls/Systems, and Building Enclosure/Facade. The Manager shall maintain the roof system, operable doors, curtain walls/systems, and building enclosure/facade at the Stadium in good repair, working order and in compliance with applicable codes. The Manager shall develop a maintenance program, in

29

consultation with the Authority, for the roof system, operable doors, curtain walls/systems and building enclosure/facade at the Stadium.

(j)     Window Washing.   The Manager shall be responsible for window washing at the Stadium Site.

### 5.4     Security; Crowd Control; Traffic and Parking, Medical; and Safety.

(a)     Security and Crowd Control for Team Events.   Pursuant to Section 24.1 of the Use Agreement, the Team has the obligation to arrange for and pay the costs of personnel for security at the Stadium Site, ticket sellers, ticket takers, ushers, public address system announcers, public restroom attendants, cleaning personnel, video operators, and such other necessary personnel as needed for the safe and commercially reasonable conduct of Team Events. The Manager shall cooperate with the Team in connection with the Team's obligation to provide such security and personnel for Team Events. The NFL has developed and is expected to continue to develop a "Best Practices" for stadium security arrangements for Team Games. The Manager shall cooperate with the Team with respect to these Best Practices. These Best Practices address such areas as (i) Perimeter Control and Stadium Security; (ii) Gate Access and Management; (iii) Credential Procedures; (iv) Command Posts; (v) Protocols for Threat Assessment; (vi) Emergency Plans; and (vii) Team Security on Game Day. The Manager will coordinate with the NFL and the Team with respect to such security matters and shall implement all security measures that are not the obligations of the Team under the Use Agreement.

(b)     General Security.   In connection with the general operations of the Stadium Site, including all Events and activities at the Stadium Site not covered by Section 5.4(a), the Manager shall be responsible for providing and arranging for security and crowd control in accordance with the terms of the Operations Manual. Other than as provided in Section 5.4(a), the Manager shall be responsible for the general safety, security and well-being of all occupants of the Stadium Site at all times, including providing and arranging for security and crowd control in connection with the Stadium Site and Events to be held therein. The Manager shall provide security by means of electronic surveillance, motorized patrols and foot patrols. The Manager's security personnel will monitor electronic surveillance equipment and will patrol the Stadium Site twenty-four (24) hours per day, seven (7) days per week. The Manager shall assign additional security personnel, as necessary, when Events are scheduled at the Stadium Site.

(c)     Medical Staffing.   The Manager shall be responsible for Event staffing of the medical personnel and implementing appropriate medical policies, as required, on an event-by-event basis.

(d)     Traffic and Parking.   Coordinate all traffic and parking issues, as applicable, related to the daily and Event activity. This effort may include but is not limited to internal traffic flow, client parking needs, available parking spaces, Stadium Site accessibility, the City of Minneapolis, Minnesota traffic control, Metro Transit with regard to the light rail trains and station, parking ramp and lot owners and operators, and the staffing of all entrances and gates. The Manager shall meet with the Team, the City of Minneapolis, Metro Transit

30

and/or other government officials regarding traffic management plans on a periodic basis as reasonably requested by the Authority.

(e)     Safety Plans.   In conjunction with the City and other applicable public safety, emergency management and law enforcement jurisdictions, the Manager shall develop and implement (i) an Emergency and Evacuation Plan and (ii) a Public Safety and Fire Management Plan for the Stadium Site.

5.5     Marketing of the Stadium Site and Urban Park and Permitting and Booking of Events.

(a)     The Manager shall be responsible for the marketing of the Stadium Site, acquiring applicable permits, and scheduling and booking the Events for the Stadium Site in coordination with the Authority.   The Manager shall also be responsible for marketing of the Urban Park on behalf of the Authority in accordance with the Urban Park Use Agreement.   In coordination with the Authority, the Manager shall (i) market, book, promote and develop Authority Events and a variety of Civic and Non-Profit Events as well as commercial events and other activities at the Stadium Site and the Urban Park, (ii) maximize net annual revenues from Authority Events and the efficient operation of the Stadium Site, (iii) maximize the utilization of the Stadium Site by all segments of the local and regional population, (iv) establish rentals rates, labor billing rates and services charges (including ticketing) for Authority Events that are generally consistent with the rates and charges for other fixed or retractable NFL stadiums in similar markets and local market conditions; (v) enhance the quality of experience for all patrons attending all events at the Stadium Site and Urban Park, (vi) maximize the number of events at the Stadium Site, (vii) work with the operator of the Urban Park and maximize the utilization of the Urban Park on behalf of the Authority in accordance with the Urban Park Use Agreement, (viii) maximize attendance at events, and, (ix) maximize the positive economic impacts and employment opportunities from the Stadium Site in fulfillment of the Authority's contracting and employment goals.   The booking of Events shall be in accordance with the booking policy set forth in the final approved Operations Manual, Stadium Site Marketing Plan and Urban Park Marketing Plan, as well as the following requirements and limitations:

(i)     The booking policy set forth in the final approved Operations Manual, Stadium Site Marketing Plan and Urban Park Marketing Plan shall be generally consistent with the booking policies previously applied at the Existing Stadium.

(ii)     The Manager shall coordinate all marketing, booking and communications related to Civic and Non-Profit Events through the Authority's designated liaison for Civic and Non-Profit Events as set forth in the Operations Manual.

(iii)     The Manager shall not book or schedule Events at the Stadium Site which conflict with the rights of the Team and the obligations of the Authority under the Use Agreement.

(iv)     The Manager shall book and schedule community and other local, public and civic Events consistent with the requirements set forth in the Act as directed by and coordinated through the Authority.

31

(v)     The Manager shall at all times cooperate and coordinate with the Authority and keep the Authority informed as to proposed bookings and Event activity held at the Stadium Site and the Urban Park. In furtherance of the foregoing, the Manager shall provide the Authority's Authorized Representative notice prior to booking any Event, such notice to contain such information reasonably requested by the Authority's Authorized Representative, including the name, nature and date of the Event, the name of the promoter and its Affiliates, the compensation arrangements of the Authority for the Event and the forecast of revenues and expenses for such Event.

(vi)    The Manager shall require that any promoter provide indemnity and insurance coverage of the Authority as set forth in the booking policy.

(b)     The Manager shall develop for approval by the Authority a marketing plan that specifies how the Stadium Site will be marketed and programmed for Authority Events for the first year of Stadium operations and, on an on-going basis, for an extended five (5) year period (the "Stadium Site Marketing Plan"). The Manager shall provide detail of efforts to be expended (means and methods), expected costs for such efforts and the returns to be made by undergoing those efforts.

(c)     The Manager shall develop for approval by the Authority a plan that details how the Urban Park will be integrated into the use of the Stadium Site for Authority Events. Further, the Manager shall develop a marketing plan for the first year of the operation of the Urban Park and, on an on-going basis, for an extended five (5) year period based on the rights of the Authority set forth in the Urban Park Use Agreement (the "Urban Park Marketing Plan"). The Manager shall provide detail of efforts to be expended (means and methods), expected costs for such efforts and the returns to be made by undergoing those efforts.

(d)     The Authority shall establish a fund for attracting and marketing Events for the Stadium Site and the Urban Park (the "Event Marketing Fund"). The Authority shall provide an initial investment of Five Hundred Thousand Dollars ($500,000) from the Manager's Capital Investment to establish the Event Marketing Fund. The monies in the Event Marketing Fund shall be held and maintained in accordance with Section 12.6 in a separate account segregated from all other operating accounts maintained by the Manager. The Event Marketing Fund shall be subject to all of the reporting requirements set forth in Section 12.12. The Event Marketing Fund shall be available for use of the Manager, upon approval of the Authority, for inducing, developing, promoting and/or producing Authority Events at the Stadium Site or Urban Park in accordance with the Stadium Site Marketing Plan and the Urban Park Marketing Plan. Additional funds, if any, shall be deposited into the Event Marketing Fund as determined by the Authority. The Manager shall promptly pay to the Authority any amounts remaining in the Event Marketing Fund upon termination of this Agreement for any reason.

5.6     Vendor Negotiation and Procurement. Subject to any applicable provisions of the Use Agreement, after the Opening Date, the Manager, upon request by the Authority, shall be responsible for the negotiations with third party vendors and for the procurement of FF&E, materials, supplies and third party services in connection with the Stadium and assisting in the purchase and procurement of the FF&E. In particular with respect to FF&E matters, following the Opening Date and if requested by the Authority, the Manager's responsibilities shall include:

32

(a)     Preparing and submitting proposed schedules for the procurement of FF&E items.

(b)     Preparing submittals for the Authority's review and approval of FF&E items, which will include a physical and technical description, and cut-sheet of the product(s) proposed, if practicable.

(c)     Preparing of technical specifications of all FF&E items based upon submittals approved by the Authority.

(d)     Developing bidding documents that satisfy all public and private bidding requirements, encourage DBE participation and conform to Authority's needs and schedule for FF&E items being purchased.

(e)     Advertising for bids and distributing bid packages; receiving and analyzing bids submitted and providing the Authority with an analysis of the bids and a recommendation for award.

(f)     Issuing purchase orders to the successful bidders and coordinating the execution and acceptance of all related documents and forms.

(g)     Coordinating with selected FF&E vendors to prepare a tentative delivery, storage and installation schedule that conforms with the construction schedule.

(h)     Preparing a plan to receive and install or store all FF&E based on the availability of loading docks, labor and storage space.

(i)     Coordinating delivery with the construction and event schedule to ensure proper delivery, storage and installation.

(j)     Negotiating firm delivery dates in writing with the FF&E vendors and oversee delivery of all FF&E.

(k)     Contracting on-site labor and supervisors required to receive, unpack, inspect, handle, inventory, store and install the FF&E.

(l)     Developing a process of document damaged items and administering the process of requiring replacement goods or missing parts from vendors.

(m)     Reviewing warranties and service agreements with on-site staff to ensure such documentation complies with requirements applicable to vendors.

(n)     Administering a FF&E invoicing system to coordinate Authority's payments to FF&E vendors, using a system approved by the Authority.

5.7     Landscape Maintenance.   The Manager shall maintain, repair and upkeep the landscape in and surrounding the Stadium Site consistent with the Authority's requirements.

33

5.8     Field Maintenance.  The Manager shall maintain, repair and upkeep the field consistent with the requirements of the Use Agreement, including those set forth in Section 24.2 thereof.

5.9     Concession Agreement.  The Manager shall manage and direct the Concessionaire and perform all of the obligations of the Manager as set forth in the Operations Manual.

5.10     Right of Entry Reserved.  Representatives of the Authority designated in writing by the Authority shall have the right to enter all portions of the Stadium Site to inspect same, to observe the performance of the Manager of its obligations under this Agreement, to install, remove, adjust, repair, replace or otherwise handle any equipment, utility lines, or other matters in, on, or about the premises, or to do any act or thing which the Authority may be obligated or have the right to do under this Agreement or otherwise. Nothing contained in this Section 5.10 is intended or shall be construed to (a) limit any other rights of the Authority under this Agreement; or (b) impose upon the Authority any independent obligation to construct or maintain or make repairs, replacements, alterations, additions or improvements or create any independent liability for any failure to do so. The Authority shall not unreasonably interfere with the activities of the Manager hereunder.

5.11     Tobacco/Chewing Gum.  The Manager shall not allow the sale of tobacco products or chewing gum, either manually or through vending machines, anywhere within the Stadium Site.

5.12     Customer Surveys and Other Performance Measurements.  The Manager agrees to conduct customer satisfaction surveys and other performance measurements at the Stadium Site as requested by the Authority and as set forth in Exhibit B. The Manager understands that the type, nature and frequency of the customer surveys and other performance measurements requested by the Authority may vary depending on the type of Event, attendance, and the areas within the Stadium Site or Urban Park that are used for the Event. The results of customer satisfaction surveys and other performance measurements shall be used to (a) measure progress and benchmark customer service and customer satisfaction compared to other comparable facilities, (b) identify and address any customer service or customer satisfaction issues that may require corrective action, and, (c) to evaluate the Manager's performance under the Agreement. The Manager shall submit to the Authority a draft customer satisfaction survey or other performance measurement template, which shall include a training manual for survey takers, within thirty (30) days of a request by the Authority to conduct such a survey or other performance measurement.   The Authority shall review and approve the draft customer satisfaction survey or other performance measurement template and training manual.   The Authority reserves the right to conduct its own customer satisfaction surveys or other performance measurements from time to time.

5.13     Limitation on Contracts Entered Into by the Manager.  Unless the Authority shall have consented in writing prior to the execution thereof, the Manager shall not enter into any agreements, contracts or understandings that:  (a) has a term longer than the Term; and (b) is with an Affiliate, parent or subsidiary of the Manager.

34

5.14 <u>Ancillary Services</u>. The Manager shall furnish all services necessary to accomplish the foregoing requirements of this Section 5.

**6.** **Authority's Reserved Rights**. The Authority shall have the sole discretion and final approval for the following: (a) the annual Operating Plan, which upon approval shall be an Approved Operating Plan, (b) the Operating Budget, which upon approval shall be an Approved Budget, (c) the Capital Funding Plan, (d) booking of those Events described in Section 5.5(a), (e) selection of the General Manager and any successor General Manager, and (f) the process for subcontracting of scheduled or contracted services pursuant to Section 9.

**7.** **Utilities**. The Manager shall be responsible for paying for all utilities for the Stadium and Stadium Infrastructure as an Operating Expense (electricity, water, chilled water, gas and sewer services), provided, however, in the event of an extraordinary rate increase, which shall be deemed to occur if and only if such increase is in the amount of five percent (5%) or more over the prior year, the Authority will in good faith consider an adjustment to the financial structure to account for such extraordinary rate increase. Additionally, the Manager shall develop an effective and continuous energy management and conservation program with the Authority for the management, operation and maintenance of the Stadium Site by the Manager throughout the Term. The Authority may establish performance goals based on energy resource conservation.

**8.** **Confidentiality/Nondisclosure**. In connection with the performance of the Manager's services hereunder, the Manager acknowledges that the Authority and the Team may provide the Manager and its employees, Affiliates, agents engaged to assist in the performance of the Consulting Services and Management Services provided for herein and subcontractors with Confidential Information (as defined below). The Manager agrees that it shall not disclose and shall keep confidential any and all Confidential Information already disclosed or to be disclosed to it by the Authority or the Team, and the Manager shall not disclose any such information, in whole or in part, to any third party except as is expressly permitted below in this Section 8.

8.1 <u>No Disclosure</u>. The Manager shall not use any Confidential Information except for the purpose of providing the Consulting Services and the Management Services. The Manager shall not directly or indirectly disclose any Confidential Information with any Person , other than employees, Affiliates, agents and subcontractors of the Manager who are directly involved with the provision of the Consulting Services and the Management Services, *provided, however,* that in the event of any such disclosure to its Affiliates, agents and subcontractors, the Manager (i) shall first inform the Authority or the Team, as applicable, of its desire to make such disclosure, and (ii) shall require such Affiliates, agents or subcontractors to execute and deliver to the Authority, or the Team, as applicable prior to any disclosure by the Manager, an agreement acknowledging a receipt of a copy of the provisions of this Section 8 and agreeing to be bound by the provisions of this Section 8 to the same extent as the Manager.

8.2 <u>Confidential Information</u>. "<u>Confidential Information</u>" shall mean any and all information that is not subject to disclosure under the public records Laws governing the Authority and is disclosed (orally, in writing, by inspection or otherwise) to the Manager by the Authority or the Team pursuant to this Agreement (or in the Manager's operational role under this Agreement) and any information developed by the Manager and based upon the information not generally available to the public that is disclosed to the Manager pursuant to this Agreement,

including disclosures made by the Team. Such information includes, but is not limited to, preliminary pricing, preliminary budgets, requests for proposals, designs, plans, proposals, lists of FF&E and personnel matters. The restrictions upon confidentiality and use of Confidential Information set forth in this Section 8 do not apply to information which (i) the Manager can demonstrate was publicly available or lawfully in its possession at the time of its disclosure to the Manager by the Authority, or (ii) is required to be released by law, regulation or binding order of a governmental agency or a court, provided that, in such case, the Manager shall first notify the Authority in order to permit it to seek a protective order or other appropriate remedy from the proper authority. Confidential Information shall not be deemed in the Manager's possession or publicly known simply because it is contained in general information in the Manager's possession.

8.3     Manager's Confidential Information. Manager as necessary may disclose confidential information of the Manager to the Authority. The Authority will only use Manager's confidential information in connection with the performance of this Agreement. The Authority will not divulge any of Manager's confidential information, in whole or in part, to any third party without the prior written consent of the Manager; provided, however, such Manager confidential information may be disclosed to the Authority's attorneys and professional consultants (including all of the Authority's consultants and agents with respect to the design, development, and construction of the Stadium Site), or as may be required by applicable law, including all open records requirements applicable to the Authority and its operations and the Stadium Site, or as directed by order of a court of competent jurisdiction.

8.4     Specific Performance. The Manager agrees that the provisions of this Section 8 are reasonable and necessary to protect the interests of the Authority and the public and that the Authority's remedies of law for a breach of any of the provisions of this Section 8 will be inadequate and that, in connection with any such breach, the Authority will be entitled, in addition to any other remedies (whether at law or in equity), to temporary and permanent injunctive relief without the necessity of proving actual damage or of the posting of a bond.

9.     **Subcontracting**.

9.1     General Ability to Subcontract. Except as set forth in Section 9.2, the Manager may subcontract certain of the services to be performed under this Agreement without prior written consent of the Authority, provided, that the Manager enters into each such subcontract agreement in accordance with the terms of this Section 9.1, State law, the Use Agreement and the Authority's procurement policies, as adopted from time-to-time. The Manager shall exercise due care in selecting any subcontractor, including by reviewing whether the subcontractor has product and service quality control, adequate fiscal and inventory controls and accountability, effective personnel procedures and training, the financial ability to fully and punctually perform their obligations under such subcontract and the general business reputation of the subcontractor. No subcontract relationship shall be entered into except upon the execution of a form of subcontract agreement to be agreed to by the Parties, which shall include appropriate insurance and indemnity coverage for the benefit of the Authority, its directors, officers and employees. The Manager shall establish programs to encourage local and DBE subcontractors and give preference to such local and DBE subcontractors if they can provide comparable quality and price terms. Any subcontracting is subject to the rights of the Team under the Use Agreement.

MSFA000072

9.2     Restrictions on Subcontracting. In addition to complying with the requirements set forth in Section 9.1, the Manager shall not, without the prior written approval of the Authority, enter into any subcontract agreement:

     (a)     that has a term that expires at a date beyond the Term of this Agreement;

     (b)     that are Major Contracts; or

     (c)     any subcontract with a dollar value of more than Fifty Thousand Dollars ($50,000) per year.

**10.     Term and Renewal Term.** The term of this Agreement shall commence on the Effective Date and shall continue until the end of ten (10) years after the Opening Date, unless earlier terminated pursuant to the provisions of this Agreement (the "Term"). The Authority may elect to extend the Term on the same terms and conditions contained herein for five (5) additional years by giving not less than sixty (60) days prior written notice of such extension to the Manager (the "Renewal Term").

**11.     Compensation.**

11.1     No Fee During Pre-Opening Period. Except for any sums to be paid by the Authority for the Manager during the Pre-Opening Period in accordance with the approved Pre-Opening Consulting Budget in accordance with Section 4.4(a), the Manager shall receive no compensation for providing the Consulting Services. In addition, except as otherwise provided herein, the Manager shall pay for all reasonable out-of-pocket expenses during the Pre-Opening Period, including but not limited to, airfare, ground transportation, meals and lodging, in the course of performing the services described in Section 4.2(a). In accordance with the Pre-Opening Consulting Budget, the Manager shall be advanced or reimbursed for the reasonable, out-of-pocket travel costs (including airfare, ground transportation, meals and lodging) incurred by the Manager or its employees or agents in the course of performing the services described in Sections 4.2(b), (c) and (d).

11.2     Manager Capital Investment. The Manager shall provide the Manager Capital Investment to the Authority no later than April 1, 2016. The Authority and the Manager agree that a portion of the Manager Capital Investment will be used to fund the Event Marketing Fund in accordance with Section 5.5(d) and the Manager's Offices in accordance with Section 19.2. The remainder of the Manager Capital Investment and any unused amounts under Sections 5.5(d) and 19.2 shall be used at the sole discretion of the Authority. For purposes of any payment required under this Section, the Manager Capital Investment shall be amortized over a period of ten (10) years commencing as of the date that the Manager Capital Investment is made, on a straight-line, non-cash, non-interest bearing basis. In the event of the expiration or termination of this Agreement for any reason, the Authority shall pay, or cause any successor management company to pay, to Manager the unamortized amount of the Manager Capital Investment existing as of such expiration or termination. The payment to the Manager shall be made to the Manager no later than sixty (60) days of the occurrence of expiration or termination.

11.3     Revenue Sharing and Manager's Compensation.

MSFA000073

(a)     The Manager shall guarantee to the Authority Six Million Seven Hundred Fifty Thousand Dollars ($6,750,000) in NOI (the "NOI Guarantee") based on the period of time commencing on the Opening Date and continuing for 365 days thereafter. For purposes of determining the NOI Guarantee for the First Partial Operating Year the NOI Guarantee will be prorated in accordance with Section 11.3(c). For each subsequent 365-day period after the First Partial Operating Year (each an "Operating Year"), the Manager shall guarantee to the Authority the NOI Guarantee, which NOI Guarantee shall be increased annually after the First Operating Year and every Operating Year thereafter by two percent (2%). The Manager shall pay to the Authority any NOI Shortfall in the First Partial Operating Year and each Operating Year that the NOI Guarantee is not achieved. The Manager and the Authority acknowledge and agree that the NOI Guarantee may be adjusted in accordance with Section 14.6(c).

(b)     If NOI for the First Partial Operating Year exceeds the NOI Guarantee in the First Partial Operating Year or if NOI in a given subsequent Operating Year exceeds the NOI Guarantee in such Operating Year, such excess funds for the applicable year will be distributed between the Authority and the Manager on the following basis; provided, however, that the NOI Benchmarks (as defined below) established below shall be increased annually after the First Operating Year and every Operating Year thereafter by two percent (2%) (the "NOI Benchmark Increase"):

(i)     If NOI for the First Partial Operating Year or each Operating Year, as applicable, exceeds the NOI Guarantee for that particular year, and (A) is less than $7,250,000, as prorated for the First Partial Operating Year, or $7,250,000 in each Operating Year (adjusted by the NOI Benchmark Increase) an amount equal to one hundred percent (100%) of the amount that is the difference between actual NOI for the applicable year and the NOI Guarantee, or (B) is greater than $7,250,000, as prorated for the First Partial Operating Year, or $7,250,000 in each Operating Year (adjusted by the NOI Benchmark Increase) an amount equal to one hundred percent (100%) of the difference between the NOI Guarantee and $7,250,001, as prorated for the First Partial Operating Year, or $7,250,001 in each Operating Year (adjusted by the NOI Benchmark Increase), then such amounts determined under (A) and (B) above shall be distributed to the Manager.

(ii)     If NOI for the First Partial Operating Year or each Operating Year, as applicable, exceeds $7,250,001, as prorated for the First Partial Operating Year, or $7,250,001 in each Operating Year (adjusted by the NOI Benchmark Increase), and (A) is less than $8,250,000, as prorated for the First Partial Operating Year, or $8,250,000 in each Operating Year (adjusted by the NOI Benchmark Increase) an amount equal to fifty percent (50%) of the amount that is the difference between actual NOI for the applicable year and $7,250,001, as prorated for the First Partial Operating Year, or $7,250,001 in each Operating Year (adjusted by the NOI Benchmark Increase), or (B) is greater than $8,250,000, as prorated for the First Partial Operating Year, or $8,250,000 in each Operating Year (adjusted by the NOI Benchmark Increase) an amount equal to fifty percent (50%) of the difference between $7,250,001, as prorated for the First Partial Operating Year, or $7,250,001 in each Operating Year (adjusted by the NOI Benchmark Increase) and $8,250,000, as prorated for the First Partial Operating Year, or $8,250,000 in each Operating Year (adjusted by the NOI Benchmark Increase), then such amounts determined under (A) and (B) above shall be distributed to the Manager.

MSFA000074

(iii)    If NOI for the First Partial Operating Year or each Operating Year, as applicable, exceeds $8,250,001, as prorated for the First Partial Operating Year, or $8,250,001 in each Operating Year (adjusted by the NOI Benchmark Increase), an amount equal to twenty five percent (25%) of the difference between the actual NOI for the applicable year and $8,250,001, as prorated for the First Partial Operating Year, or $8,250,001 in each Operating Year (adjusted by the NOI Benchmark Increase) shall be distributed to the Manager.

(iv)    For purposes of Section 11.3(b) above "NOI Benchmarks" shall mean the NOI amounts set for the First Partial Operating Year and each Operating Year, as applicable, in Sections 11.3(b)(i) – (iii) above.

(c)    The NOI Guarantee for the First Partial Operating Year shall be determined as follows:

(i)    the Manager will prepare an Operating Budget for approval by the Authority for both the (A) First Partial Operating Year and (B) First Operating Year;

(ii)    upon approval by the Authority of the Operating Budgets for the First Partial Operating Year and First Operating Year set forth above, the NOI projected for the First Partial Operating Year will be divided by the NOI projected for First Operating Year and then, such ratio will be multiplied by $6,750,000 and that amount shall be deemed to be the NOI Guarantee for the First Partial Operating Year;

(iii)    a corresponding adjustment shall be made to the NOI Benchmarks in the same proportion as the pro-ration of the NOI Guarantee determined above in Section 11.3(c)(ii) for the First Partial Operating Year.

(d)    The NOI Guarantee for the last year of the Term ("Last Partial Operating Year") shall be pro-rated consistent with the methodology in Section 11.3(c) and shall be utilized in a manner consistent with that used for the First Partial Operating Year under Section 11.3(b).

(e)    For the First Partial Operating Year and each Operating Year, the Manager shall provide an NOI calculation report evidencing the NOI, as calculated by the Manager, for the applicable operating year (the "NOI Calculation Report"), within fifteen (15) days of the end of the applicable operating year. Any NOI Shortfall payment due to the Authority from the Manager or revenue sharing distribution between the Authority and the Manager shall be completed within thirty (30) days of the receipt of the NOI Calculation Report by the Authority; provided, however, that the Authority shall have the right to audit all of the books of the Manager relating to such NOI Calculation Report and if any such audit demonstrates that the NOI for the applicable operating year reflected in such NOI Calculation Report is understated or overstated, the Manager shall pay to the Authority the reasonable cost of such audit. The Manager shall promptly pay to the Authority any funds that have not been properly received by the Authority and the Authority shall promptly pay to the Manager any funds owed to the Manager, as a result of the audit.

(f)    In the event that the Stadium Site or Urban Park is unavailable to the Manager for purposes of hosting Authority Events under this Agreement due to the occurrence of

MSFA000075

an Unavailability Period, the Parties will in good faith consider an adjustment to the financial structure to account for such occurrence or suspension.

**12.    Funding; Budgets; Bank Accounts.**

12.1    Operating Plan.    The Manager shall provide to the Authority on or before March 1, 2016 and on or before September 1st for each subsequent year, a draft Operating Plan, developed in coordination with the Authority, which shall include the Operating Budget described in Section 12.2 for the partial year ending December 31, 2016 and for each subsequent year for the upcoming Fiscal Year. The draft Operating Plan shall include information regarding the Manager's anticipated operations for such Fiscal Year, including planned operating maintenance activities by the Manager, requested Capital Enhancement and Capital Improvement purchases and an anticipated budget therefor, anticipated Events at the Stadium Site, anticipated advertising, marketing and promotional activities, planned equipment and furnishings purchases, accommodation for a Team-owned MLS Franchise (as defined in the Use Agreement) and such other information as the Authority may request. The draft Operating Plan shall be subject to review, revision and approval by the Authority, in consultation with the Team. Following review and revision by the Authority, the Manager shall have thirty (30) days to incorporate the Authority's revisions into its proposed Operating Plan. Upon approval by the Authority, the draft Operating Plan shall constitute the approved "Approved Operating Plan" for the Manager for the following Fiscal Year.

12.2    Operating Budget; Cash Flow Budget.

(a)    As part of the Operating Plan described in Section 12.1, the Manager will prepare and submit, in coordination with the Authority, an Operating Budget to meet the scope of services and objectives under this Agreement, including compliance with the Expected Facility Standard. Such budget shall contain appropriate detailed line items for revenues and expenses and the projected Net Operating Income/Loss (the "Net Operating Income/Loss Goal") and if there are any Team required amenities (as governed under the Use Agreement) or NFL-Mandated Amenities (as defined in the Use Agreement) any such costs associated with those changes shall be reflected in the Operating Budget.

(b)    The Manager shall prepare and submit to the Authority by March 1, 2016 and on or before September 1st for each subsequent year a cash flow budget for the partial year ending December 31, 2016 and for each subsequent year for the upcoming Fiscal Year.

(c)    The budgets referred to in subparagraphs (a) and (b) above shall be reviewed and are subject to approval by the Authority, in consultation with the Team. By May 1, 2016 and by October 1 of each subsequent year during the term of this Agreement, the Authority shall notify the Manager of any changes to the proposed Operating Budget and the cash flow funding budget proposed by the Manager and with such changes, if any, as are made by the Authority, such budget(s) shall be an "Approved Budget" upon the approval of the Authority for the upcoming Fiscal Year.

12.3    Capital Management and Planning.    Manager shall be responsible for the preparation, in coordination with the Authority, by March 1, 2016 and on or before September 1st

MSFA000076

for each subsequent year during the term hereof a Capital Funding Plan for the review and approval of the Authority, in consultation with the Team, with respect to the Capital Improvement and Capital Enhancements. Such plans shall include the following:

(a) A description of the Capital Enhancements and Capital Improvements that the Manager would recommend be made to the Stadium Site. The Manager shall provide a complete explanation and justification for each recommended Capital Enhancement or Capital Improvement, and identify necessitating factors (e.g., obsolescence, warranties, and improvements);

(b) A description of the capital equipment that the Manager would recommend be purchased for the Stadium Site. The Manager shall provide justification for all new equipment, and the condition and proposed disposition of all equipment to be replaced;

(c) A prioritization of such Capital Improvements, Capital Enhancements and capital equipment;

(d) An estimate of the costs associated with such Capital Improvements, Capital Enhancements and capital equipment and expected payback/ROI or other metric to inform the Authority of expected returns by expending said capital;

(e) Plan for the disposition of replaced assets; and

(f) Such other information as the Authority may request.

12.4 Budget Modifications Proposed by the Manager. The Manager may submit to the Authority at any time prior to the end of a Fiscal Year a supplement or revision to the Approved Budget for such Fiscal Year. Upon the written approval of the Authority of such supplemental or revised budget, the Approved Budget for such Fiscal Year shall be amended to incorporate such supplement or revision. The Approved Budget may only be amended as set forth in Section 12.5 below or in the two preceding sentences.

12.5 Budget Modifications Proposed by the Authority. If in the reasonable opinion of the Authority it appears likely that, in any Fiscal Year during the Term hereof, that the actual Net Operating Income may be smaller, or the Net Operating Loss may be larger, than projected in the Approved Budget for such Fiscal Year, the Authority may request from the Manager a plan for reduction of Operating Expenses to a level that is consistent with achieving the Net Operating Income/Loss Goal. In the event the Manager and Authority agree with such expense reduction requested by the Authority, the Approved Budget for such Fiscal Year shall be modified accordingly.

12.6 Receipts and Disbursements. The Manager shall establish and maintain in one or more depositories designated by the Authority one or more payroll, operating and other bank accounts for the marketing, operation and management of the Stadium Site and Urban Park in the name of the Authority and under the Authority's federal identification number, with the Manager as agent and with signature authority in such employees of the Manager as the Manager and Authority shall determine. All Operating Revenues shall be deposited into such accounts and the Manager, as agent for the Authority, shall pay Operating Expenses from such accounts. All

41

Operating Revenues are the sole property of the Authority, held in trust by the Manager for the Authority. The Manager shall promptly pay to the Authority any amounts remaining in such accounts upon termination of this Agreement for any reason, after payment of all outstanding Operating Expenses.

12.7 Operating Funds. Subject to Section 12.2, following the approval of an Approved Budget for a Fiscal Year (including, without limitation, any Operating Budget applicable to the first Fiscal Year during the term hereof), upon reasonable notification by the Manager that the Manager anticipates there will be insufficient funds in the accounts pursuant to Section 12.6 to pay the following month's Operating Expenses, the Authority shall on a monthly basis provide available funds necessary to pay Operating Expenses for the following month including taking into account all monies collected and deposited by the Manager pursuant to Section 12.6. If the Authority fails to fund Operating Expenses as specified in this Section, the Manager will provide to the Authority written notice of any funding shortfall and the Authority shall have thirty (30) days from the date of such written notice to provide such funding for Operating Expenses. If such funding is not provided within such 30-day period, then the Manager shall provide such funding and be relieved of its obligation to pay the NOI Guarantee for the remaining portion of the applicable Operating Year.

12.8 Non-Funding. The Authority shall have no obligation to provide funds for the payment of Operating Expenses incurred or committed for after the date the Manager receives written notice of the fact that insufficient funds or no funds have been appropriated for the Stadium as provided in the Act.

12.9 Ticket Sales Revenues. The Manager shall hold in a separate interest-bearing account in a banking institution depository in Minneapolis, Minnesota (or such other city in Minnesota, if mutually agreed by the Parties) any ticket sale revenues that it receives with respect to an Event to be held at the Stadium Site and Urban Park (the "Ticket Revenue Account"). The sums on deposit in the Ticket Revenue Account shall be held for the protection of ticket purchasers, the Authority and the Manager, and to provide a source of funds to pay, as required, performers and promoters and Event Expenses. Following the Event, the Manager shall deposit into the operating accounts established pursuant to Section 12.6 the amount in the Ticket Revenue Account and shall pay from the operating account Event Expenses. After each Event, the Manager shall provide the Authority with a full settlement report for that Event.

12.10 Capital Enhancements. The obligation to pay for, and authority to perform, direct and supervise Capital Improvements and Capital Enhancement purchases shall remain with the Authority and/or the Team as set forth in the Use Agreement, as applicable, and will not be considered Operating Expenses, provided that nothing herein shall prevent the Authority from requesting that the Manager participate in the performance, direction or supervision of such improvements and purchases.

12.11 Funds for Emergency Repairs. Notwithstanding any other terms of this Section 12, the Manager shall have the right to act (including making necessary expenditures for emergency repairs or improvements, whether or not funds exist in the operating accounts of the Stadium Site for such purpose) in situations which the Manager determines to be an emergency with respect to the safety, welfare and protection of the general public, and the Manager shall be

MSFA000078

promptly reimbursed by the Authority for any such actions and expenditures; provided, however, that in the event that any such emergency expenditure will exceed Five Thousand Dollars ($5,000), the Manager must first obtain the written approval of the Authority before proceeding with such expenditure, unless it would be unreasonable to obtain such approval due to the circumstances of such emergency, in which case the Manager must at least notify by telephone the Authority's Authorized Representative. In any event, as soon as the Manager becomes aware of the emergency situation and if not before, then immediately thereafter, the Manager shall inform the Authority of the situation and the action taken.

12.12   Financial Reports.   By the fifteenth (15th) day of each month, the Manager shall provide to the Authority a written monthly report for the previous month, including year to date totals, in a form approved by the Authority. The monthly reports shall include, but not be limited to the following:   (a) monthly cash flow reports, (b) monthly financial and service reports, (c) monthly invoices, (d) monthly cash summary, (e) monthly remittance and settlement reports, (f) anticipated Events list and summary, (g) previous month's Events list and summary, (h) accounting for previous month's Event Expenses and Event revenues, (i) bank statements with reconciliations, (j) monthly reports on bid awards, including designating which bids were awarded to DBE and local subcontractors (k) summary of the Event Marketing Fund, and (l) narrative summary of the monthly reports, and each of the foregoing items shall be accompanied by comparisons from the same period during the prior Fiscal Year, if applicable. The Manager shall also provide the Authority income statement quarterly analysis, event repeat analysis and year-over-year statistical analysis. The Manager shall provide to the Authority an annual report sixty (60) days after the end of the Authority's Fiscal Year and shall include, but not be limited to the following: (1) annual financial and service reports, (2) Event wins, demand and attendance growth, (3) sales and services advances, (4) uses of funds from and the effectiveness of such use of funds from the Event Marketing Fund, (5) key employee, vendor and Event successes, (6) customer service advances, and (7) an economic and fiscal impact summary.

**13.    Records, Audits and Reports.**

13.1    Records and Audits.

(a)    The Manager shall keep full and accurate accounting records relating to its activities at the Stadium Site and Urban Park in accordance with generally accepted accounting principles. The Manager shall maintain a system of bookkeeping adequate for its operations hereunder which shall include digital document management methods acceptable to the Authority including consideration of document management policies of the State and the Minnesota Legislative Auditor.    The Manager shall give the Authority's Authorized Representatives access to such books and records maintained at the Stadium Site during reasonable business hours and upon reasonable advance notice. The Manager shall also keep records of written and electronic documents and other historical items in accordance with the Authority's document retention plan, as directed by the Authority.

(b)    The Manager shall keep and preserve for at least seven (7) years following each Fiscal Year all sales slips, rental agreements, purchase order, accounts receivable and accounts payable records, sales books, credit card invoices, bank books or duplicate deposit slips, and other evidence of Operating Revenues and Operating Expenses for such period.

43

**EXECUTION VERSION**

(c)      In addition, on or before March 1 following each Fiscal Year during the Term and any Renewal Term, the Manager shall furnish to the Authority a balance sheet, a statement of profit or loss, a statement of cash flows and applicable notes to the financial statements for the Stadium, Stadium Infrastructure and Urban Park for the preceding Fiscal Year, prepared in accordance with generally accepted accounting principles and accompanied by an independent auditor's report of a nationally recognized, independent certified public accountant. The audit shall contain an opinion expressed by the independent auditor of the accuracy of financial records kept by the Manager and of amounts due to the Authority. The audit shall also provide a certification of Operating Revenues and Operating Expenses as defined in this Agreement for such Fiscal Year. A reputable firm selected by the Manager with the Authority's approval shall conduct the audit. The Authority shall not withhold or delay such consent or approval unreasonably. Notwithstanding anything to the contrary herein, the costs of such audit shall be deemed Operating Expenses.

(d)      The Authority shall have the right at any time, and from time to time, to cause nationally recognized independent auditors and the Minnesota Legislative Auditor to audit all of the books of the Manager relating to Operating Revenues and Operating Expenses, including, without limitation, cash register tapes, credit card invoices, duplicate deposit tapes, and invoices. No costs incurred by the Authority in conducting such audit shall be considered an Operating Expense. If any such audit demonstrates that the Operating Revenues or Operating Expenses reflected in any financial statements prepared by the Manager and audited as specified in the foregoing subparagraph (a) are understated (in the case of Operating Revenues) or overstated (in the case of Operating Expenses), the Manager shall pay to the Authority the reasonable cost of such audit and shall promptly refund to the Authority any funds that have not been properly received by the Authority. If such audit(s) show a deficiency in payments by Manager in excess of Twenty Five Thousand Dollars ($25,000) in such payments for any period covered, Manager shall pay to the Authority, in addition to the total amount owing, the cost of the audit and interest at the Interest Rate, computed from the date of deficiency until fully paid.

13.2      Accounting Records. The Manager will maintain all accounting records and documents regarding management, operation and maintenance at the Stadium Site throughout the term of this Agreement and for a period of three (3) years after termination of this Agreement, all in accordance with generally accepted accounting principles and in form, content, substance and level of detail reasonably satisfactory to the Authority. The Manager will, on reasonable demand, make available to the Authority or its designee all records, books of account and statements maintained with respect to management, operation and maintenance at the Stadium Site and all costs associated therewith that have been reimbursed to the Manager pursuant to the terms hereof and the Manager will provide all such records to the Authority no later than three (3) years after termination of this Agreement.

13.3      Management and Maintenance Plan. At least twelve (12) months prior to the projected Opening Date, the Manager must provide the Authority with a management and maintenance plan, which shall at a minimum include the follow elements:

(a)      An organization chart showing the Manager's full-time General Manager for the Stadium Site and all full-time positions planned for the operations at the Stadium Site denoting anticipated annual salary for each position.

44

(b)     A repair, maintenance and cleaning plan ("RMCP") for the Stadium Site. The RMCP should include a definition of the frequency (time interval) and the various repair, maintenance and cleaning functions, including refuse and waste disposal and a plan for Capital Repairs necessary for depreciated or obsolete items.

(c)     Detailed accounting and financial control systems to be implemented by the Manager including, at a minimum, sample forms, procedures, policies related to cash handling, inventory control, audit, data processing and management/client informational reporting.

(d)     A detailed energy management and conservation program for the management, operation and maintenance at the Stadium Site.

(e)     The preliminary plan for marketing Authority Events at the Stadium Site and Urban Park. This plan should detail the marketing plans independent of and in conjunction with tourism officials, convention and visitors bureaus and Minneapolis-St. Paul Metropolitan Area business leaders.

(f)     Any other information that the Authority requests or the Manager feels is pertinent to the success of the management, operation and maintenance of the Stadium Site or Urban Park.

**14.     Indemnification and Insurance.**

14.1     Indemnification.

(a)     The Manager will protect, defend, indemnify and hold harmless the Authority, Team, and their respective Affiliates, and such Persons' owners, shareholders, managers, directors, officers, employees, agents, heirs, successors, assigns, administrators, and personal representatives, (collectively, the "Authority Indemnitees"), from and against any and all claims, losses, liabilities, damages, obligations, fines, penalties, awards, judgments, costs and expenses (including reasonable attorneys' fees), in law or in equity, for bodily injury, personal injury, illness, disease, death or damage to property (collectively, "Losses") arising from (i) the negligent, tortuous, willful, act, error or omission by the Manager or its directors, officers, employees, Affiliates or those of its agents engaged to assist in the performance of the Consulting Services and Management Services provided for herein (the "Manager Parties"), (ii) any breach of any warranty, representation or covenant made by the Manager; (iii) any breach, failure or omission of any of the Manager Parties to perform any obligations, covenants or agreements made in this Agreement, (iv) any violation of any intellectual property rights by any of the Manager Parties, unless provided by the Authority for use by the Manager and (v) any environmental liabilities or conditions caused by the Manager Parties; provided, however, that the foregoing indemnification shall not extend to Losses to the extent such Losses arise out of the grossly negligent act or omission of the Authority Indemnitees, or any default or breach of this Agreement by the Authority.

(b)     The Authority will defend, indemnify and hold harmless the Manager and its respective directors, officers and employees (collectively, the "Manager Indemnitees"), from and against any Losses arising from (i) any material default or breach by the Authority of its

45

obligations specified herein, (ii) any environmental condition at the Stadium Site or on or under the premises on which the Stadium Site is located not caused by the Manager Indemnitees, (iii) any structural or design defect with respect to the Stadium Site (including any such defect that directly results in noncompliance with the Americans with Disabilities Act) not caused by the Manager Indemnitees, (iv) the negligent, tortuous, willful, act, error or omission by the Authority, (v) any act or omission carried out by the Manager at or pursuant to the express written direction or instruction of the Authority or its Authorized Representative, or (vi) the failure of the Authority to pay any amounts due by the Authority or to otherwise perform any obligations of the Authority under any third party contracts, licenses or agreements, including those entered into by the Manager in furtherance of its duties hereunder and as authorized hereby; provided, however, that the foregoing indemnification under clauses (i) and (ii) shall not extend to Losses to the extent such Losses arise out of the negligent act or omission of the Manager Indemnitees, or any default or breach of this Agreement by the Manager.

(c)     The terms of all insurance policies referred to in Section 14.2, including without limitation (i) the property insurance policies of the Authority, and (ii) the policies of any independent contractors retained by the Authority or hired by the Manager, shall preclude subrogation claims against the Manager, its partners, the Authority and their respective officers, directors, employees and agents.

14.2    Liability Insurance.

(a)     The Manager shall secure and deliver to the Authority prior to the commencement of the Term hereunder and shall keep in force at all times during the Term and any Renewal Term of this Agreement, a commercial General Liability insurance policy covering the premises and operations hereunder, containing not less than the following: (i) $2,000,000 General Aggregate; (ii) $2,000,000 Products and Completed Operations Aggregate; (iii) $1,000,000 Each Occurrence; (iv) $1,000,000 Personal and Advertising Injury Liability; and (v) $1,000,000 Damage to Rented Premises. Coverage shall include (1) independent contractors, (2) broad form contractual liability, (3) broad form property damage, (4) incidental medical malpractice for professionals working at the request of the Manager, (5) certified acts of terrorism, (6) XCU, (7) the general aggregate shall apply per location, and (8) Additional Insured Forms CG 2010 and CG 2037. There shall be no exclusions or limitations with regard to insured matters for claims that may be made by contractors, subcontractors, vendors and/or users of the Stadium Site, or with respect to assault and battery, punitive damages or host liquor liability.

(b)     The Manager shall also maintain umbrella liability insurance written in the amount of Fifty Million Dollars ($50,000,000) written on an occurrence basis, following form underlying policies, and excess of the retained limit of the primary liability policies for bodily injury, property damage, personal injury and advertising injury.

(c)     The Manager shall also maintain Comprehensive Automotive Bodily Injury and Property Damage Insurance for business use covering all vehicles hired, owned or leased by the Manager, including the loading and unloading thereof, and operated by the Manager officers, agents and employees in connection with the Stadium Site, with a combined single limit of not less than One Million Dollars ($1,000,000), single limit for bodily injury and property damage liability combined (including an extension of hired and non-owned coverage).

46

(d)     The Manager shall be the named insured under all such policies. The Authority, the Team (each entity within such definition) and their respective Affiliates, and their respective owners, partners, members, shareholders, officers, directors, employees, agents and other representatives, shall be additional insureds under the foregoing insurance policies, as their interests may appear, and each additional insured shall be provided the same coverage as the named insured, including the cost of defense, against claims for bodily injury or death and property damage occurring in or upon or resulting from the primary insured's use or occupancy of the Stadium Site and the Urban Park or from or out of the primary insured's or its members, officers, directors, employees, agents, contractors or licensees negligence in performance or non-performance related in any way to this Agreement. The foregoing coverage does not extend to coverage for acts or omissions of the additional insureds under the foregoing insurance policies, as their respective interests may appear, and said policies shall contain a provision covering the Parties' indemnification liabilities to each other. As between the Authority and the Manager, the Manager's insurance required pursuant to Sections 14.2(a) and (b) shall be primary with respect to claims brought against the additional insureds arising out of the Consulting Services or the Management Services provided by the Manager under the terms of this Agreement. The Manager shall cause the issuers of the insurance required pursuant to Sections 14.2(a) and (b) to include waivers of the rights of recovery and subrogation.

(e)     Certificates evidencing the existence of the above policy, or policies, all in such form as the Authority may reasonably require, shall be delivered to the Authority and the Team prior to the commencement of the Term. Notwithstanding the provisions of this Section 14.2, the Parties hereto acknowledge that the above policies may contain exclusions from coverage that are reasonable and customary for policies of such type. Each such policy or certificate shall contain a valid provision or endorsement stating, "This policy will not be canceled or materially changed or altered without first giving thirty (30) days' written notice thereof to the Minnesota Sports Facilities Authority, Attention: Executive Director and CEO, sent by certified mail, return receipt requested." The Authority does not represent and warrant to the Manager that the types of insurance and the amounts of coverage specified herein are adequate or suitable for the Manager.

(f)     All policies of insurance shall require that the policy may not be suspended, voided, canceled, non-renewed, or reduced in coverage or in limits without thirty (30) days prior written notice by certified mail, return receipt requested to the Authority and the Manager. All policies shall be issued by a company or companies authorized to business in the State with a Best's Insurance Reports rating of no less than AV status covering all operations under this Agreement. By no later than at least twenty (20) days prior to a policy's expiration date except for any policy expiring on the termination date of this Agreement or thereafter, the Manager shall furnish the Authority with original insurance certificates evidencing the required coverages and copies of receipts of payment of premiums regarding such policies.

(g)     The Parties agree to amend the provisions of this Section 14.2 from time to time as necessary when, in the reasonable discretion of the Authority, it is necessary to ensure there is adequate insurance coverage for the operations of the Manager or if any of the required insurance coverage is not commercially available or is only available at rates that are unacceptable to the Authority.

47

14.3   Surety and Guaranty.   The Manager shall be required to furnish to the Authority, nine (9) months prior to the scheduled Opening Date, a surety bond executed by the Manager as principal and by a surety company licensed to do business in the State and reasonably acceptable to the Authority as surety, in a form and in an amount equal to One Million Dollars ($1,000,000) and a corporate guaranty of Manager in an amount equal to the NOI Guarantee in a form satisfactory to the Authority.   This surety will be conditioned upon the faithful performance by the Manager of all other conditions and covenants of this Agreement.

14.4   Workers Compensation and Employer's Liability Insurance.   The Manager shall at all times maintain worker's compensation insurance (including occupational disease hazards) with an authorized insurance company or through an authorized self-insurance plan approved by the State, insuring its employees at the Stadium Site in amounts equal to or greater than required under law if necessary and prudent.   The Manager shall at all times maintain Employer's Liability Insurance with limits of not less than (a) One Million Dollars ($1,000,000) Each Accident, (b) One Million Dollars ($1,000,000) Each Employee by Disease, and (c) One Million Dollars ($1,000,000) Policy Limit by Disease.

14.5   Crime Coverage.   The Manager shall provide to the Authority Crime Coverage in an amount not less than One Million Dollars ($1,000,000) covering all of the Manager's personnel under this Agreement for each loss, to reimburse the Authority for Losses experienced due to the dishonest acts of the Manager's employees, dishonesty; forgery or alteration, theft, disappearance and destruction inside and outside the Stadium Site and robbery and safe burglary inside and outside the Stadium Site.

14.6   Property Insurance.

(a)   The Manager shall maintain sufficient property damage or loss insurance to cover personal property owned by the Authority and the Manager at the Stadium Site and shall maintain such insurance throughout the term of this Agreement.   The Manager shall cause the Authority to be named as an additional insured under all of the Manager's property damage or loss insurance policies required pursuant to this Section 14.6(a).   Each such policy or certificate shall contain a valid provision or endorsement stating, "This policy will not be canceled or materially changed or altered without first giving thirty (30) days' written notice thereof to Minnesota Sports Facilities Authority, Attention: Executive Director and CEO, sent by certified mail, return receipt requested."   The Parties agree to amend the provisions of this Section 14.6(a) from time to time as necessary when, in the reasonable discretion of the Authority, it is necessary to ensure there is adequate insurance coverage for the operations of the Manager.

(b)   The Authority shall, subject to Sections 14.2 and 14.6(c), maintain its current property insurance covering the premises of the Stadium Site.   The Authority shall cause the Manager to be named as an additional insured under all of the Authority's property and hazard insurance policies covering or relating to the Stadium Site.   In addition, the Authority shall, with respect to the Losses covered by such property and hazard insurance and business interruption and extra expenses insurance, waive any subrogation rights that it may have against the Manager, its partners and Affiliates and their respective officers, employees and agents, whether or not the Authority self-insures for the Losses covered by such insurance.   Nothing in this Agreement is intended to require the Manager to maintain property and hazard insurance

48

covering the premises at the Stadium Site or business interruption insurance covering the interruption of operations by or for whatever cause at the Stadium Site.

(c)     Notwithstanding Section 14.6(b), the Authority acknowledges and agrees that the Manager may, at its own cost, solicit a quote for property insurance covering the premises of the Stadium Site and, if such quote provides for cost savings in comparison to the property insurance quote secured by the Authority, based on substantially similar terms and conditions, the Authority shall procure the property insurance through the Manager's provider or make an equitable adjustment to the NOI Guarantee under Section 11.3(a). Additionally, the Authority and the Manager acknowledge that the Team shall have such insurance coverages and payment responsibilities for insurance solely as provided in and in accordance with the Use Agreement.

14.7     Certain Other Insurance and Indemnification.     The Authority shall use its commercially reasonable efforts to require the Concessionaire to name the Manager as an additional insured under any insurance required by the Authority under the Concession Agreement with such party, and to name the Manager as an indemnitee under any indemnification provided by such party thereunder, If the Manager enters into any agreements during the Term with any independent contractors for the provision of services hereunder, the Manager shall require such contractors to name the Authority as an additional insured under any insurance required by the Manager thereunder and to deliver to the Manager prior to the performance of such services a certified copy of such policy, plus a certificate evidencing the existence thereof, which policy contains the same type of endorsements and provisions as provided in Sections 14.2(d), 14.6(a) and 14.6(b).

**15.     Ownership of Assets**. The ownership of buildings and real estate, technical and office equipment and facilities, furniture, displays, fixtures, vehicles and similar tangible property located at the Stadium Site shall remain with the Authority, except for any such items purchased by the Manager with its own funds, which items shall be owned by the Manager and for items purchased by the Team for its own account, which items shall be owned by the Team. The ownership of and title to all intellectual property rights of whatsoever value, held in the Authority's name shall remain in the name of the Authority. The ownership of consumable assets (such as office supplies and cleaning materials) purchased with Operating Revenues or Authority funds shall remain with the Authority, but such assets may be utilized and consumed by the Manager in the performance of Management Services under this Agreement.     The ownership of data processing programs and software owned by the Authority shall remain with the Authority, and the ownership of data processing programs and software owned by the Manager shall remain with the Manager. The Manager shall not take or use, for its own purposes, marketing materials or plans, advertisements, customer or exhibitor lists or similar materials developed by or for the Authority for the use of the Stadium Site, unless prior written consent is granted by the Authority. Title and ownership of equipment, furnishings, materials, or fixtures not considered to be real property and other personal property purchased by the Manager with Authority funds for use at and for the Stadium Site shall automatically and immediately upon purchase or acquisition be vested in the Authority. The Manager shall keep the assets of the Authority as described herein free and clear of all liens, pledges or other encumbrances resulting from the actions of the Manager or the provision of the Consulting Services or the Management Services.

49

**16.   Assignment; Affiliates.**

16.1   No Assignment. The Manager may not assign this Agreement or any of the rights or obligations without the prior written consent of the Authority. For purposes of this Section 16.1, the term "assign" includes any transfer of this Agreement, directly or indirectly, as the result of a merger, acquisition, consolidation, sale of assets or sale of stock or other ownership interest to any other Person without the express written consent of the Authority. Any attempt to assign this Agreement in contravention to the provisions of this Section 16.1 shall be grounds for the immediate termination of this Agreement by the Authority.

16.2   The Manager's Affiliates.

(a)   Transactions with Affiliates. In connection with its management responsibilities hereunder relating to the purchase and/or procurement of equipment, materials, supplies, inventories, and services for the Stadium Site, the Manager shall have the right, but not the obligation, to purchase and/or procure from, or otherwise transact business with, an Affiliate of the Manager. In the event the Manager purchases or procures from, or otherwise transacts business with, an Affiliate of the Manager as contemplated by the foregoing sentence, the prices charged and services rendered shall be competitive with those obtainable from other persons who are not Affiliates rendering comparable goods and/or services of like kind. To ensure compliance in this respect, the Manager agrees to obtain at least two (2) other competitive bids from persons other than the Manager's Affiliates whenever the Manager proposes to transact business with an Affiliate for the provision of such goods or services hereunder. In addition, the Manager may license the use of the Stadium Site or any part thereof to itself in connection with any Event in the promotion of which the Manager is involved, so long as the license fee charged is on prevailing rates and terms or such other rates and terms as the Authority approves.

(b)   Conflicts of Interest. The Authority acknowledges that the Manager manages or owns other public facilities that may, from time to time, be in competition with the Stadium Site. In all instances in which the Stadium Site is in competition with other public facilities managed or owned by the Manager for the solicitation of certain Events, the Manager shall not, without the prior written consent of Authority, involve its principal office (located in West Conshohocken, Pennsylvania) on behalf of any such other public facility in an attempt to influence the decision-making process regarding the selection of a site for such Events.

**17.   Laws and Permits.**

17.1   Permits, Licenses, Taxes and Liens. The Manager shall use reasonable efforts to procure any permits and licenses required for the business to be conducted by it hereunder. The Authority shall cooperate with the Manager in applying for such permits and licenses. The Manager, upon request by the Authority, shall deliver copies of all such permits and licenses to the Authority. The Manager shall pay promptly, out of the accounts specified in Section 12.6, all taxes, excises, license fees and permit fees of whatever nature arising from its operation, marketing and management of the Stadium Site. The Manager shall use reasonable efforts to prevent any liens, including but not limited to mechanic's or materialman, from becoming attached to the premises or improvements at the Stadium Site, or any part or parcel thereof, by reason of any work or labor performed or materials furnished by any mechanic or materialman,

so long as the work, labor or material was provided at the Manager's direction and the Authority has supplied funds for the payment of charges therefor in accordance with this Agreement.

17.2   Compliance With Laws.   The Manager, its officers, Affiliates, agents and employees shall comply with all federal, state, local and City regulations, ordinances, statutes, rules, laws and constitutional provisions (collectively, "Laws") applicable to the Manager's management of the Stadium Site hereunder and the performance of the Consulting Services and the Management Services, including without limitation the American With Disabilities Act (the "ADA"). Nothing in this Section 17.2 or elsewhere in this Agreement shall, however, require the Manager to undertake any of the foregoing compliance activity, nor shall the Manager have any liability under this Agreement therefor, if such activity requires any Capital Enhancements. Furthermore, the Manager shall have the right to require any licensee, lessee, tenant, promoter or user of any portion of the Stadium Site to comply, and to be financially responsible for compliance with Title III of the ADA in connection with any Events at the Stadium Site.

## 18.   Termination.

### 18.1   Termination Upon Default.

(a)   In addition to the events of default specified in Section 18.1(b) below, the Authority may terminate this Agreement for default as set forth in Section 18.1(a)(i) through (iv):

(i)   the Manager failed to achieve the scoring criteria set forth in Sections 1(a)(v), 1(b)(iv) and 1(d)(v) of Exhibit B, as supplemented by the Operations Manual, and thereafter a right to terminate arises by operation of Sections 1(c) and 1(d)(vi) of Exhibit B;

(ii)   the Manager failed to achieve the scoring criteria as set forth in Sections 2(a)(iv), 2(b)(iii), and 2(c)(iii) of Exhibit B, as supplemented by the Operations Manual, and thereafter a right to terminate arises by operation of Sections 2(a)(v), 2(a)(vi), and 2(d) of Exhibit B;

(iii)   the Manager failed to achieve the scoring criteria set forth in Sections 3(a)(iii), 3(b)(i), 3(b)(ii) and 3(c)(v) of Exhibit B, as supplemented by the applicable Stadium Site Marketing Plan, Urban Park Marketing Plan and Operating Budget, and thereafter a right to terminate arises by operation of Sections 3(d)(i) and 3(d)(ii) of Exhibit B,; and

(iv)   the Manager failed to perform or comply with objectives established by the Authority and the Act in accordance with Section 5.2(f) regarding workforce and business inclusion and such failure continues for more than sixty (60) days after written notice thereof from the Authority.

(b)   Either Party may terminate this Agreement upon a default by the other Party hereunder. A Party shall be in default hereunder if:

(i)   such Party fails to pay any sum payable hereunder within thirty (30) days after same is due and payable;

(ii)     such Party fails in any material respect to perform or comply with any of the other terms, covenants, agreements or conditions hereof and such failure continues for more than sixty (60) days after written notice thereof from the other Party;

(iii)    such Party is placed in bankruptcy, becomes financially insolvent and unable to perform its duties, or admits in writing its inability to pay debts, then the non-bankrupt Party may place the other Party in default and terminate this Agreement; or

(iv)    such Party fails to maintain insurance or pay insurance premiums and such default is not cured within thirty (30) days.

(c)     In the event that a default (other than a default in the payment of money), as specified above in Sections 18.1(b), is not reasonably susceptible to being cured within the cure period, the defaulting Party shall not be considered in default if it shall within such cure period have commenced with due diligence and dispatch to cure such default and thereafter completes with dispatch and due diligence the curing of such default.

(d)     Should the Authority terminate this Agreement in accordance with Section 18.1(a) or 18.1(b), the NOI Guarantee shall be pro-rated on a monthly basis (with pro-ration calculated as of the final day of the month in which notice of termination is delivered from the Authority to the Manager) and a corresponding adjustment made to the NOI Benchmarks in the same proportion as the pro-ration of the NOI Guarantee.  For purposes of the NOI Calculation Report required under Section 11.3(e), the Manager shall prepare a final NOI Calculation Report within fifteen (15) days after the final day of the month in which notice of termination is delivered from the Authority to the Manager, which shall also be the effective date of the termination.  Any payment due pursuant to such NOI Calculation Report shall be made within thirty (30) days of delivery of the NOI Calculation Report.  The Authority shall have the right to audit all of the books of the Manager relating to such NOI Calculation Report in accordance with Section 11.3(e).

18.2    Termination Other than Upon Default.

(a)     The Authority shall have the right to terminate this Agreement upon thirty (30) days written notice to the Manager during the (i) Pre-Opening Period, (ii) First Operating Year and (iii) after the date that is the sixth (6th) anniversary of the Opening Date (the "Sixth Anniversary"); provided, however, if the Authority terminates this Agreement after the Sixth Anniversary in accordance with (iii) above it shall pay a onetime fee of Two Hundred Fifty Thousand Dollars ($250,000) to the Manager on the date that is thirty (30) days after it provides written notice of termination to the Manager.

(b)     Should the Authority terminate this Agreement in accordance with Section 18.2(a), the NOI Guarantee shall be pro-rated on a monthly basis (with pro-ration calculated as of the final day of the month in which notice of termination is delivered from the Authority to the Manager) and a corresponding adjustment made to the NOI Benchmarks in the same proportion as the pro-ration of the NOI Guarantee.  For purposes of the NOI Calculation Report required under Section 11.3(e), the Manager shall prepare a final NOI Calculation Report through the date of termination within fifteen (15) days after the final day of the month in which notice of

termination is delivered from the Authority to the Manager, which shall also be the effective date of the termination. Any payment due pursuant to such NOI Calculation Report shall be made within thirty (30) days of delivery of the NOI Calculation Report. The Authority shall have the right to audit all of the books of the Manager relating to such NOI Calculation Report in accordance with Section 11.3(e).

(c)     The Authority shall have the right to terminate this Agreement without further obligation or liability to the Manager (other than payment of sums already due and owing), if construction of the Stadium is not completed for any reason.

18.3     Effect of Termination. In the event this Agreement expires or is terminated, (i) all Operating Expenses incurred or committed for prior to the date of expiration or termination shall be paid using funds on deposit in the account described in Section 12.6 based on the obligations of the Authority and Manager under Section 11.2, and (ii) all contracts entered into by the Manager in furtherance of its duties hereunder and within the authority granted to the Manager hereby, shall be assigned to the Authority. Upon the expiration of this Agreement or a termination of this Agreement, all further obligations of the Parties hereunder shall terminate except for the obligations in this Section 18.3 and in Sections 13.1(b), 13.2, 14.1, 18.1(d), 18.2(b), and 18.4 and the Authority's obligations under Section 11.2; provided, however, that if such termination is the result of a willful default, the non-defaulting Party exercising its right to terminate this Agreement shall be entitled to recover damages for breach arising from such willful default.

18.4     Surrender of Premises. Upon termination of this Agreement (termination shall, for all purposes in this Agreement, include termination pursuant to the terms of this Section 18 and any expiration of the Term or any Renewal Term), the Manager shall surrender and vacate the Stadium Site upon the effective date of such termination. The Stadium Site and all FF&E shall be returned to the Authority in good repair, reasonable wear and tear excepted, to the extent funds were made available therefor by the Authority. All reports, records, including financial records, and documents maintained by the Manager at the Stadium Site relating to this Agreement other than materials containing the Manager's proprietary information shall be immediately surrendered to the Authority by the Manager upon termination.

**19.     Miscellaneous.**

19.1     Use of Stadium Site at Direction of Authority.

(a)     At the direction of the Authority, the Manager shall provide use of the Stadium Site or any part thereof for Civic and Non-Profit Events in accordance with the terms and conditions of this Agreement.

(b)     The Authority shall have the right to use the Stadium Site or any part thereof for such purposes as meetings, seminars, training classes or other non-commercial uses without the payment of any rental or use fee.

19.2     Manager's Offices. The Authority shall provide to the Manager finished space for the Manager's Offices in the Stadium. The Authority shall utilize up to Two Hundred Fifty Thousand Dollars ($250,000) of the Manager Capital Investment to furnish the Manager Offices,

which shall include commercially reasonable types and quantities (as determined by the Authority) of furniture and equipment to enable the Manager to perform its duties hereunder. Such furniture and equipment shall be owned by the Authority; provided, however, any operating repairs or maintenance shall be considered Operating Expenses. The Manager may supply additional furniture and equipment for the Manager's Offices, and retain ownership thereof, at the Manager's sole expense.

19.3    Cooperation with Further Financing.

(a)    If necessary or desirable in connection with any financing of the Stadium, the Manager agrees that, without charge or expense to the Authority, within twenty (20) Business Days after the request by the Authority, to deliver an opinion letter from independent legal counsel to the Manager regarding the due execution and authority of the Manager to execute this Agreement and to perform its obligations hereunder and such other matters as are reasonably requested by the Authority.

(b)    The Manager shall, without charge or expense to the Authority, at any time and from time to time, within ten (10) Business Days after written request therefore from the Authority, execute, acknowledge and deliver a written estoppel certificate certifying the following: (i) whether or not this Agreement is unmodified and in full force and effect (or if there have been modifications, that this Agreement is in full force and effect as modified and stating such modifications), (ii) whether or not the Manager has knowledge of any then uncured default by the Authority under this Agreement (and if the Manager has such knowledge, specifying the same in detail), (iii) the address of the Manager to which notices should be sent, and (iv) any other factual information reasonably requested by the Authority.

(c)    In addition, the Manager agrees to modify this Agreement or any other necessary contract documents in good faith as reasonably necessary to accommodate any tax-exempt or taxable bond financing obtained by the Authority for the for the design and construction of the Stadium, provided that any such modifications shall, to the maximum extent possible, preserve the economic benefits afforded to the Manager hereunder, and shall not materially increase the Manager's obligations hereunder or materially decrease the Manager's rights or economic benefits hereunder, provided, that if the foregoing modifications to preserve the rights and economic benefits and not increase the obligations of the Manager are not possible, the Manager shall have the right to terminate this Agreement. Without limiting the generality of the preceding sentences, the Manager acknowledges and agrees that the respective cash contributions (or letters of credit or other funding devices) or receipts of the Authority from the activities of the Manager under this Agreement may be pledged to the holders of the bonds issued or to be issued by the Authority to finance the design and construction of the Stadium and may be held in trust by the trustee for such bonds.

19.4    Governing Law; Venue; Resolution of Disputes. This Agreement is entered into in the City of Minneapolis, Minnesota, and shall be governed, interpreted and enforced in accordance with the internal Laws of the State, without regard to applicable conflicts of laws provisions or principles of comity which would cause this Agreement to be interpreted or governed by the applicable Law of any state other than the State. The Parties agree that the exclusive venue for any claims or actions arising under or in relation to this Agreement and the

rights, responsibilities and duties of the Parties hereunder shall be in Hennepin County, Minneapolis, Minnesota.

19.5    Use of Stadium Names and Logos.  Subject to the provisions of Section 11.4 of the Use Agreement, the Manager shall have the right to use throughout the Term (and permit others to use in furtherance of the Manager's obligations hereunder), without restriction and for no charge, the name and all logos of the Stadium, on the Manager's stationary, in its advertising of the Stadium, and whenever conducting business of the Stadium; provided, that the Manager shall take all prudent and appropriate measures to protect the intellectual property rights of the Authority relating to such name and/or logos.  As between the Manager and the Authority, all intellectual property rights in any Stadium logos developed by the Manager or the Authority shall be and at all times remain the sole and exclusive property of the Authority.  The Manager agrees to execute any documentation requested by the Authority from time to time to establish, protect or convey any such intellectual property rights.

19.6    Entire Agreement.  This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings with respect thereto.  No other agreements, representations, warranties or other matters, whether oral or written, will be deemed to bind the Parties hereto with respect to the subject matter hereof.

19.7    Amendments.  This Agreement shall not be altered, modified or amended in whole or in part, except in a writing executed by each of the Parties hereto.

19.8    Force Majeure.

(a)    The prevention or delay in the performance of either Party's obligations under this Agreement caused by acts of war, riot, rebellion, acts of God, actions of governmental agencies, or any other circumstances beyond the reasonable control of either Party (any such event being called "Force Majeure") shall entitle the Party affected to suspend the obligations of that Party under the terms of this Agreement to the extent and for so long as its performance of the Management Services is made impracticable by such event of Force Majeure, by the affected Party giving written notice thereof to the other Party.  The Party invoking the provisions of this Section 19.8 will not be liable for non-performance of any obligations under this Agreement during continuation of such event; provided, however, that such Party exercises its best efforts to limit and obviate the event of Force Majeure.

(b)    Subject to Section 19.8(a), in the event of damage to or destruction of the Stadium Site by reason of fire, storm or other casualty or occurrence of any nature or any regulatory action or requirements that, in either case, is expected to render the Stadium Site materially unusable for Events notwithstanding the Authority's reasonable efforts to remedy such situation for a period estimated by the Authority of at least six (6) months from the occurrence of the event, either Party may terminate this Agreement by written notice to the other. Should either Party terminate this Agreement in accordance with this Section, the NOI Guarantee shall be pro-rated on a monthly basis (with pro-ration calculated as of the final day of the month in which the Force Majeure first occurred) and a corresponding adjustment made to the NOI Benchmarks in the same proportion as the pro-ration of the NOI Guarantee.  For purposes of the

55

NOI Calculation Report required under Section 11.3(e), the Manager shall prepare a final NOI Calculation Report through the date on which the Force Majeure first occurred within fifteen (15) days of the date of notice of termination, which shall also be the date of termination. Any payment due pursuant to such NOI Calculation Report shall be made within thirty (30) days of receipt of the NOI Calculation Report. The Authority shall have the right to audit all of the books of the Manager relating to such NOI Calculation Report in accordance with Section 11.3(e).

(c)      Subject to Sections 19.8(a) and (b), if the Authority and the Manager agree to continue the Management Services subsequent to such suspension of performance, the Authority and the Manager will in good faith consider adjustments to this Agreement (if any) to account for the ongoing impact such event of Force Majeure under this Section 19.8.

19.9      Binding Upon Successors and Assigns.      This Agreement and the rights and obligations set forth herein shall inure to the benefit of, and be binding upon, the Parties hereto and each of their respective successors and permitted assigns.

19.10      Third-Party Beneficiaries.

(a)      Except as otherwise expressly stated herein, this Agreement shall not be construed as giving any Person, other than the Parties hereto and their successors and permitted assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any of the provisions herein contained, this Agreement and all provisions and conditions hereof being intended to be, and being, for the sole and exclusive benefit of such Parties and their successors and permitted assigns and for the benefit of no other Person.

(b)      The Manager and the Authority acknowledge and agree that the Team is a direct and intended third party beneficiaries of this Agreement. The foregoing shall be deemed by the Parties to include the direct right to enforce terms of this Agreement which arise from, in connection with, or incident to, the interests of the Team under this Agreement. In addition to the foregoing, it is acknowledged and agreed that the Manager shall use best reasonable commercial efforts to coordinate and cooperate with the Team in the timing, delivery and provision of the Management Services for Team Events, including coordination with representatives to resolve operational and other issues which arise in connection with the Management Services.

19.11      Notices.      Any notice, consent or other communication given pursuant to this Agreement will be in writing and will be effective either (a) when delivered personally to the Party for whom intended, (b) on the second (2nd) Business Day following mailing by a nationally recognized overnight courier service, (c) on the fifth (5th) day following mailing by certified or registered mail, return receipt requested, postage prepaid, or (d) on the date transmitted by facsimile as shown on the confirmation as long as such facsimile transmission is followed by mailing of such notice by certified or registered mail, return receipt requested, postage prepaid, in any case addressed to such Party as set forth below or as a Party may designate by written notice given to the other Party in accordance herewith.

To the Authority:

Minnesota Sports Facilities Authority
511 11th Avenue South, Suite 401
Minneapolis, Minnesota 55415
Attn:   Ted A. Mondale
       Chief Executive Officer/ Executive Director

With a copy to:

Dorsey & Whitney, LLP
50 South 6th Street Suite 1500
Minneapolis, Minnesota 55402
Attn:   Jay Lindgren

To the Team:

Minnesota Vikings Football, LLC
Minnesota Vikings Football Stadium, LLC
9520 Viking Drive
Eden Prairie, MN 55344
Attn.:  Kevin Warren
       Executive Vice President - Legal Affairs &
       Chief Administrative Officer
Attn.:  Steven D. Poppen
       Executive Vice President of Finance &
       Chief Financial Officer

With a copy to:

Briggs and Morgan, Professional Association
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Attn:   Michael J. Grimes

To the Manager:

SMG
300 Conshohocken State Rd.
Suite 770, West Conshohocken, PA 19428
Attn:   President
Attn:   Counsel

With a copy to:

57

CASE 0:17-cv-01179-PAM-TNL   Document 132-1   Filed 01/04/18   Page 63 of 74

Stradley Ronon Stevens & Young, LLP
30 Valley Stream Parkway
Malvern, PA 19355-1481
Attn:   Steven A. Scolari

19.12   Severability.   The invalidity or unenforceability of any particular provision, or part of any provision, of this Agreement shall not affect the other provisions or parts hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions or parts were omitted.

19.13   Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original copy of this Agreement.

19.14   Non-Waiver.   A failure by either Party to take any action with respect to any default or violation by the other of any of the terms, covenants, or conditions of this Agreement shall not in any respect limit, prejudice, diminish, or constitute a waiver of any rights of such Party to act with respect to any prior, contemporaneous, or subsequent violation or default or with respect to any continuation or repetition of the original violation or default.

19.15   Section Headings; Defined Terms.   The section headings contained herein are for reference purposes only and shall not in any way affect the meaning and interpretation of this Agreement.   The terms defined herein and in any agreement executed in connection herewith include the plural as well as the singular and the singular as well as the plural, and the use of masculine pronouns shall include the feminine and neuter.   Except as otherwise indicated, all agreements defined herein refer to the same as from time to time amended or supplemented or the terms thereof waived or modified in accordance herewith and therewith.

19.16   Governing Law.   This Agreement will be governed by and construed in accordance with the internal Laws of the State, without giving effect to otherwise applicable principles of conflicts of law.

19.17   Certain Representations and Warranties.

(a)   The Authority represents and warrants to the Manager the following: (i) all required approvals have been obtained, and the Authority has full legal right, power and authority to enter into and perform its obligations hereunder, and (ii) this Agreement has been duly executed and delivered by the Authority and constitutes a valid and binding obligation of the Authority, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization or similar Laws affecting creditors' rights generally or by general equitable principles.

(b)   The Manager represents and warrants to the Authority the following: (i) all required approvals have been obtained, and the Manager has full legal right, power and authority to enter into and perform its obligations hereunder, and (ii) this Agreement has been duly executed and delivered by the Manager and constitutes a valid and binding obligation of the Manager, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization or similar Laws affecting creditors' rights generally or by general equitable principles.

MSFA000094

19.18 Calculation of Time.   Whenever any provision of this Agreement requires or permits any act or decision to be performed or made within a specified period of time, the day of the act or event from which the designated time period begins to run shall not be included in computing such time period.   The last day of such period shall be included, unless it is a Saturday, Sunday or a legal holiday of the State or the United States of America, in which case, the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday of the State of Minnesota or the United States of America.   All notice and other time periods shall expire as of 5:00 p.m. (Minneapolis time) on the last day of the notice or other period.

19.19 Data Practices Act.   The Manager acknowledges that the requirements of Minnesota Statutes, section 13.05, subdivision 11, apply to companies or individuals who perform a government function under this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**[SIGNATURE PAGE FOLLOWS]**

59

MSFA000095

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement effective as of the Effective Date.

MINNESOTA SPORTS FACILITIES
AUTHORITY,
a public body and political subdivision of
the State of Minnesota

By: _____
    Name: Michele Kelm-Helgen
    Title: Chair

By: _____
    Name: Ted Mondale
    Title: CEO/Executive Director

SMG,
a general partnership
existing under the laws of the
Commonwealth of Pennsylvania

By: _____
    Name:
    Title:

**[SIGNATURE PAGE TO MANAGEMENT AND PRE-OPENING SERVICES
AGREEMENT]**

MSFA000096

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement effective as of the Effective Date.

MINNESOTA SPORTS FACILITIES AUTHORITY,
a public body and political subdivision of the State of Minnesota

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

SMG,
a general partnership
existing under the laws of the
Commonwealth of Pennsylvania

By:_____
    Name:   Harold Westley
    Title:    President & CEO

**[SIGNATURE PAGE TO MANAGEMENT AND PRE-OPENING SERVICES AGREEMENT]**

MSFA000097

**EXHIBIT A**

**Authority Personnel**

1.  Senior Stadium Director
2.  Manager of Parking Operations and Maintenance
3.  Manager of Business Operations
4.  Lead Security Guard – Loading Dock
5.  Security Personnel
6.  Business Operations Assistant
7.  Technical Maintenance (HVAC) Position 1
8.  Technical Maintenance (HVAC) Position 2
9.  Technical Maintenance (HVAC) Position 3
10. Technical Maintenance (HVAC) Position 4
11. General Maintenance Position 1
12. General Maintenance Position 2
13. General Maintenance Position 3
14. General Maintenance Position 4

MSFA000098

**EXHIBIT B**

**Qualitative Performance Measures**

The Parties agree that the Manager will be measured based on the scoring criteria listed in this Exhibit B as the same may be supplemented in accordance with this Exhibit B (the "Qualitative Performance Measures").

1. **Customer Service**: The Manager shall conduct, or participate in, regular customer satisfaction surveys or other performance measurements to measure qualitative performance in this category as directed by the Authority in accordance with Section 5.12. The customer service component of Manager's annual performance evaluation shall be determined through a collection of data from at least the following sources, unless otherwise agreed to by the Authority:

    a. Manager Customer Satisfaction Survey

        i. The Manager customer satisfaction survey is to be administered by the Manager as detailed in the Operations Manual, but at a minimum, surveys will be distributed to customers through various means and methods subsequent to each Event or as otherwise agreed to by the Authority.

        ii. The Manager customer satisfaction survey shall be designed to assess and grade general customer service and customer satisfaction in at least six key performance areas (to be detailed in the Operations Manual) and the results shall be compared to other public assembly facilities operated or managed by the Manager.

        iii. Performance shall be based on a scoring system measured on a 1 - 10 scale (with 10 being the highest score) or other such agreed upon scoring system.

        iv. The Manager will be evaluated on the key performance areas that the Manager controls or directly manages as set forth in the Operations Manual.

        v. The Manager shall maintain a minimum overall average rating of eight (8) for the agreed upon key performance areas (or comparable rating if an alternative scoring system is utilized) and ratings that are at least comparable to the average score of other public assembly facilities operated or managed by the Manager.

        vi. Dashboard and detailed reports will be provided to the Authority on at least a quarterly basis or as otherwise agreed by the Authority.

    b. Intercept Surveys / Mystery Shopper Reports:

B - 1

MSFA000099

    i.   The Authority may retain, at its cost, a qualified third party contractor, in consultation with the Manager, to perform customer intercept surveys, mystery shopping or other similar services.

    ii.   The specific areas of performance evaluation for the intercept surveys and/or mystery shopper reports will be subject to the final determination by the Authority, but such surveys or mystery shoppers shall not interfere with the Manager's ability to perform its duties under this Agreement and shall include only those areas of performance that the Manager controls or directly manages as set forth in the Operations Manual.

    iii.   A rating system for the customer intercept surveys, mystery shopping or other similar services will be established as a part of the Operations Manual.

    iv.   The Manager shall maintain a minimum average overall rating of eight (8) for the agreed upon key performance areas based on a scoring system measured on a 1 - 10 scale (with 10 being the highest score or a minimum overall rating of eighty percent (80%) satisfaction for the agreed upon key performance areas based on a scoring system measured on a 100 percent scale (with 100 percent being the highest score)).

c.  Manager Compliance

    i.   For Team Games if the Manager customer satisfaction survey or the intercept/mystery shopper reports (Section 1(a) and 1(b)) fall below the measurements set forth in Sections 1(a)(v) or 1(b)(iv) for two Team Games during the then applicable season, the Manager will be in default and shall provide a Corrective Action Plan to remedy such default within 15 days of notification of the second occurrence. If the Manager fails an additional Manager customer satisfaction survey or intercept/mystery shopper reports during such applicable Team season as set forth in either Sections 1(a)(v) or 1(b)(iv), the Authority may terminate the Agreement in accordance with Section 18.1(a) thereof.

    ii.   For Authority Events, if the Manager customer satisfaction survey or the intercept/mystery shopper reports (Section 1(a) and 1(b)) fall below the measurement set forth in Sections 1(a)(v) or 1(b)(iv), respectively in the aggregate on a quarterly basis, the Manager will be in default and shall provide a Corrective Action Plan to remedy such default within 15 days of notification of such default. If the Manager falls below the measurement set forth in either Sections 1(a)(v) or 1(b)(iv), respectively in the aggregate for the subsequent quarter, the Authority may terminate the Agreement in accordance with Section 18.1(a) thereof.

d. NFL "Voice of the Fan Survey" (or comparable survey, if the survey is no longer conducted by the NFL).

    i. The NFL Voice of the Fan Survey is currently an annual report issued by the NFL to all 32 member clubs.

    ii. The NFL Voice of the Fan Survey is designed to measure performance and satisfaction in many areas of facility operation and customer service.

    iii. The Manager will be evaluated on the key performance areas that the Manager controls or directly manages as set forth in the Operations Manual.

    iv. Performance is measured through a ranking system in various categories as compared to other NFL teams.

    v. The Manager shall maintain a minimum overall rating within the top quartile of all NFL teams participating in the current NFL Voice of the Fan Survey.

    vi. If the 'Voice of the Fan' survey falls below the measurement set forth in Section 1(d)(v), the Manager will be in default and shall provide a Corrective Action Plan to remedy such default within 30 days of notification of such default. If the Manager falls below the measurement set forth in Section 1(d)(v) in the subsequent year, the Authority may terminate the Agreement in accordance with Section 18.1(a) thereof.

2. **Quality Operating Standards**: As a part of evaluating the Manager's performance under the Agreement, including the Quality Operating Standard and the Expected Facility Standard, the following actions shall be undertaken at the request of the Authority:

    a. Intercept Surveys / Mystery Shopper Reports:

        i. The Authority may retain, at its cost, a qualified third party contractor, in consultation with the Manager, to perform customer intercept surveys, mystery shopper or other similar services to assess the Managers performance in key performance areas.

        ii. The specific areas of performance evaluation for the intercept surveys and/or mystery shopper reports will be subject to the final determination of the Authority, but will not interfere with the Manager's ability to perform its duties under the Agreement, and shall include only those areas of performance that the Manager controls or directly manages as set forth in the Operations Manual.

B - 3

   iii.  A rating system for the customer intercept surveys, mystery shopping or other similar services will be established as a part of the Operations Manual.

   iv.  The Manager shall maintain a minimum overall rating of eight (8) for the agreed upon key performance areas based on a scoring system measured on a 1 - 10 scale (with 10 being the highest score) or a minimum overall rating of eighty percent (80%) for the agreed upon key performance areas based on a scoring system measured on a 100 percent scale (with 100 percent being the highest score).

   v.  For Team Games, if the intercept/mystery shopper reports fall below the measurement set forth in Section 2(a)(iv) for two Team Games during the then applicable season, the Manager will be in default and shall provide a Corrective Action Plan to remedy such default within 15 days of notification by the Authority of the second occurrence. If the Manager fails an additional intercept/mystery shopper report during such applicable Team season in accordance with Section 2(a)(iv), the Authority may terminate the Agreement in accordance with Section 18.1(a) thereof.

   vi.  For Authority Events, if the intercept/mystery shopper reports fall below the measurement set forth in Section 2(a)(iv), in the aggregate on a quarterly basis, the Manager will be in default and shall provide a Corrective Action Plan to remedy such default within 15 days of notification by the Authority of such default. If the Manager falls below the measurement set forth in Sections 2(a)(iv), in the aggregate for the subsequent quarter, the Authority may terminate the Agreement in accordance with Section 18.1(a) thereof.

b.  Manager Computerized Maintenance Management System:

   i.  In addition to all rights set forth in the Agreement, the Authority or a qualified third party contractor retained by the Authority may perform a review of the preventive maintenance logs prepared by the Manager for the Stadium Site, the Manager's detailed work orders, code compliance, and perform annual inspections of the maintenance performed by the Manager and the documentation of such maintenance in the computerized maintenance management system as detailed in the Operations Manual.

   ii.  All such information as detailed in the Operations Manual will be provided on a quarterly basis to the Authority.

   iii.  If, through the aforementioned review by the Authority or the qualified third party contractor, it is determined by the Authority or the qualified third party contractor, the Manager is not performing or recording the noted function(s) in accordance with the Operations Manual, the Manager

B - 4

MSFA000102

shall provide to the Authority documentation to show that the Manager has performed, complied with and properly recorded the required preventative maintenance and code compliance at a minimum of ninety-five percent (95%) proficiency in accordance with the Operations Manual.

c.  Facility Inspections:

   i.  In addition to all rights set forth in the Agreement, the Authority or a qualified third party contractor retained by the Authority may perform regular facility inspections to evaluate equipment, cleanliness and general maintenance. The Manager may assign a representative to attend the inspections, if so desired.

   ii.  A rating system will be established in the Operations Manual to measure the applicable categories.

   iii.  The Manager shall maintain a minimum overall rating of eight (8) for the agreed upon key performance areas based on a scoring system measured on a 1 - 10 scale (with 10 being the highest score) or a minimum overall rating of eight percent (80%) for the agreed upon key performance areas based on a scoring system measured on a 100 percent scale (with 100 percent being the highest score).

d.  Manager Compliance with Sections 2(b) and 2(c). If the Manager computerized maintenance management system (Section 2(b)) or facility inspection reports (Section 2(c)) fall below the measurements set forth in Section 2(b)(iv) or 2(c)(iii), respectively in the aggregate on a quarterly basis, the Manager will be in default and shall provide a Corrective Action Plan to remedy such default within 15 days of notification of such default. If the Manager falls below the measurement set forth in Section 2(b)(iv) or 2(c)(iii), respectively in the aggregate for the subsequent quarter, the Authority may terminate the Agreement in accordance with Section 18.1(a) thereof.

3.  **Event Marketing and Booking**: The Manager's performance under the Agreement related to Event marketing and booking will be measured, in part, through the following:

   a.  Event Solicitation:

      i.  Performance measures will be included in the Stadium Site Marketing Plan and Urban Park Marketing Plan to measure the Manager's outreach to local stakeholders, event organizers, promoters, national governing bodies and others who are engaged in event production or event development.

      ii.  A rating system will be established as a part of the Stadium Site Marketing Plan and Urban Park Marketing Plan.

B - 5

MSFA000103

      iii.  The Manager shall maintain a minimum overall rating of eight (8) for the agreed upon key performance areas based on a scoring system measured on a 1 - 10 scale (with 10 being the highest score) or a minimum overall rating of eight percent (80%) for the agreed upon key performance areas based on a scoring system measured on a 100 percent scale (with 100 percent being the highest score).

b.  Quantity of Annual Events:

      i.  The Manager shall book at least as many events on a weighted average at the Stadium Site and Urban Park in the event categories specified below as are held at other comparable multi-purpose stadiums, including Lucas Oil Field, University of Phoenix Stadium, NRG Stadium, Mercedes Benz Superdome, Edward Jones Dome and other venues that are of comparable nature to the Stadium Site and Urban Park as measured by agreed upon benchmarks as set forth in the Stadium Site Marketing Plan and Urban Park Marketing Plan.

      ii.  The Manager shall book at least eighty percent (80%) of the events set forth in the Stadium Site Marketing Plan, the Urban Park Marketing Plan and the applicable year's Operating Budget in at least the following event categories: (A) major spectator events, (B) corporate/private events, (C) Civic and Non-Profit Events, and (D) other events.

c.  Community Use and Activation:

      i.  The Manager will comply with the requirements of the Act with regard to Minnesota State High School League and Minnesota Amateur Sports Commission events.

      ii.  The Manager shall document all inquiries from Civic and Non-Profit Events regarding use of the Stadium Site or Urban Park for an Event providing measurable statistics regarding the number and types of inquiries and the reasons for not utilizing the Stadium Site or Urban Park if the Civic and Non-Profit Event is not held at the Stadium Site or Urban Park.

      iii.  The Manager shall document all efforts to attract Civic and Non-Profit Events to the Stadium Site or Urban Park providing measurable statistics regarding the number and types of organizations contacted and other such measures as set forth in the Stadium Site Marketing Plan and Urban Park Marketing Plan.

      iv.  A rating system will be established as a part of the Stadium Site Marketing Plan and Urban Park Marketing Plan.

MSFA000104

    v.  The Manager shall maintain a minimum overall rating of eight (8) for the agreed upon key performance areas based on a scoring system measured on a 1 - 10 scale (with 10 being the highest score) or a minimum overall rating of eighty percent (80%) for the agreed upon key performance areas based on a scoring system measured on a 100 percent scale (with 100 percent being the highest score).

d.  Manager Compliance.

    i.  If the Manager's event solicitation (Section 3(a)) or community use and activation (Section 3(c)(i) – (iii)) rating falls below the measurements set forth in Sections 3(a)(iii) or 3(c)(v) (in each case for Sections 3(c)(i) – (iii)), respectively in the aggregate on an quarterly basis, the Manager will be in default and shall provide a Corrective Action Plan to remedy such default within 15 days of notification of such default.  If the Manager falls below the measurement set forth in Sections 3(a)(iii)or 3(c)(v) (in each case for Sections 3(c)(i) – (iii)), respectively in the aggregate for the subsequent quarter, the Authority may terminate the Agreement in accordance with Section 18.1(a) thereof.

    ii.  If the Manager's quantity of annual events (Section 3(b)) rating falls below the measurements set forth in Sections 3(b)(i) or 3(b)(ii), respectively in the aggregate on a annual basis, the Manager will be in default and shall provide a Corrective Action Plan to remedy such default within 30 days of notification of such default.  If the Manager falls below the measurement set forth in Sections 3(b)(i) or 3(b)(ii), respectively in the aggregate for the subsequent year, the Authority may terminate the Agreement in accordance with Section 18.1(a) thereof.

MSFA000105