UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Anastacio Lemus Lopez,　　　　　　　　　　　Civ. No. 17-1179 (PAM/TNL)

　　　　　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　**MEMORANDUM AND ORDER**

Minneapolis Chief of Police Janeé
Harteau; City of Minneapolis;
Minneapolis Police Officers Russell
Cragin, Anthony Rodin, Michael Grahn,
Michael Fossum, Stephen McCarty, and
Gerald Moore,

　　　　　　Defendants.

---

This matter is before the Court on Defendants' Motion for Summary Judgement (Docket No. 242) and Defendants' Motions to Exclude Expert Testimony (Docket Nos. 245, 250, 256). For the following reasons, the Motion for Summary Judgment is granted and the Motions to Exclude Expert Testimony are denied.

**BACKGROUND**

Lopez is a longtime Minnesota Vikings fan from Midland, Texas. He traveled to Minnesota to attend a Vikings game at U.S. Bank Stadium on December 1, 2016. Lopez had at least two drinks before the game, and at least two or three beers at the game. (Robertson Decl. (Docket No. 244) Ex. A (Lopez Dep.) at 40-41, 51-52; Ex. B (Herrera Dep.) at 36.) At around 9:30 pm, fans signaled to a security guard on the field that there was a disturbance in their section. The security guard, Andrew Hodynsky, testified that Lopez was pushing and shoving past other fans. (Robertson Decl. Ex. D (Hodynsky Dep.)

at 23.) A stadium employee told Hodynsky that he thought Lopez was going to fight someone because Lopez was drunk and unruly. (Id. at 23.)

Hodynsky approached Lopez and asked him to step into the aisle. Lopez refused to go with him, so Hodynsky radioed Minneapolis police to request that they eject Lopez from the stadium. (Id. at 54.) Minneapolis police officers Anthony Rodin and Russell Cragin arrived and began leading Lopez to a holding cell, followed closely by Hodynsky.

Because Lopez has no memory of the events following his removal from the stands (Lopez Dep. at 55), the majority of the remaining facts come from the individual Defendants' testimony and security video of the events. The officers told Lopez that they would walk him to a holding cell and then escort him out of the stadium. (Robertson Decl. Ex. F (Trial Tr.) at 69; Ex. G (Rodin Dep.) at 51-52.) Throughout the walk to the holding cell, Lopez repeatedly stopped to talk to members of the public. (Rodin Dep. at 53.) Each time he stopped, the officers took hold of his elbow and guided him forward. (Id.)

The trio passed through double doors and entered a hallway. Lopez began turning, so Rodin again took his elbow to lead him forward. (Id. at 53-54.) Rodin testified that as he did this, Lopez said, "If you touch me again, I will put your face into the concrete." (Id. at 54.) A hallway security camera captured the rest of the interaction. Lopez rolled his shoulder away from Rodin, and Rodin tried to regain control of Lopez. (Robertson Decl. Ex. H (Security Video) at 0:58.) Lopez turned to face Rodin, the two struggled slightly, and then Lopez reached for Rodin's chest. (Id. at 0:59-1:00.) Rodin decided to take Lopez to the ground to handcuff him. (Rodin Dep. at 55.) Rodin attempted to tackle Lopez, and they ran into a nearby wall before falling onto the floor. (Security Video 1:01-1:03).

2

Seeing Rodin struggling to control Lopez, Cragin got onto the floor and used his body weight to control Lopez's upper half. (Trial Tr. at 86.) Lopez then began wrestling with Cragin and reaching for Cragin's belt. Hodynsky and the officers testified that at different stages of the struggle, Lopez attempted to grab Cragin's flashlight, taser, and firearm. (Hodynsky Dep. at 58-59; Robertson Decl. Ex. E (Cragin Dep.) at 36; Trial Tr. at 89; Rodin Dep. at 57-58.)

While Lopez struggled with Cragin, Rodin struck Lopez in the abdomen four times with his knee and punched him in the shoulder twice, trying to remove Lopez's arm from Cragin's belt area. (Security Video at 1:06-1:14.) Lopez then used his free arm to grab the firearm on the right side of Cragin's toolbelt. (Id. at 1:19.) Hodynsky stepped in and pulled Lopez's hand away from the gun. (Id. at 1:20). Hodynsky testified that Lopez had his hand on the handle of Cragin's firearm. (Hodynsky Dep. at 58-59.) At some point during the altercation, Lopez also grabbed Cragin's flashlight with such force that he broke one of the leather straps holding the flashlight in place. (Trial Tr. 126-27.) Lopez continued struggling, and Rodin delivered two blows to Lopez's face. (Security Video at 1:20.) Cragin then told Rodin he was going to use his taser. (Cragin Dep. at 37.)

Cragin fired his taser at Lopez's abdomen, but the probes were ineffective. (Id. at 38.) He fired a second round and the probes lodged in Lopez's hand, but Lopez continued to struggle. (Id. at 38-39.) Cragin then used the "touch stun" feature of the gun, which incapacitated Lopez. (Id. at 39.) After the stun took effect, Lopez raised his hands upward in a "surrender" position and the officers handcuffed him. (Security Video at 1:32.) The officers then activated their body cameras and led Lopez to the holding cell, where

3

paramedics removed the probes from his hand and checked him for additional injuries. (Robertson Decl. Ex. J (Rodin Body Cam Video) at 7:35-8:28.) Although Lopez claims that he suffered broken bones, medical reports indicate that he only suffered fairly minor head and hand injuries. (See generally Robertson Decl. Ex. M (Medical Records).)

Lopez's Amended Complaint contains 14 counts: (1) § 1983 claim for excessive use of force; (2) § 1983 Monell claim for improper training and supervision; (3) § 1985 claim for conspiracy to deprive Lopez of constitutional rights; (4) assault; (5) battery; (6) negligence; (7) negligent supervision and training; (8) intentional infliction of emotional distress; (9) negligent infliction of emotional distress; (10) false arrest; (11) false imprisonment; (12) malicious prosecution; and (13 and 14) respondeat superior in negligence against other Defendants for Rodin and Cragin's conduct. (Docket No. 93). In Lopez's Opposition Memorandum, Lopez concedes that summary judgment on his excessive force claim is proper as to four of the named officers (Grahn, Fossum, McCarty, and Moore), and that there is no genuine issue of material fact as to his Monell, conspiracy, negligent training/supervision, and malicious prosecution claims. (Docket No. 267 at 35, 39, 40).

The remaining Defendants are the City of Minneapolis, the former Minneapolis Chief of Police Janeé Harteau, and six Minneapolis police officers. They now move for summary judgment, arguing that qualified immunity defeats Lopez's claims.

# DISCUSSION

## A. Summary Judgment Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and inferences that "may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." Enter. Bank v. Magna Bank of Mo., 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

## B. Qualified Immunity and Excessive Force

### 1. Qualified Immunity Standard

Defendants first argue that the officers are entitled to qualified immunity on Lopez's § 1983 claim. A police officer "is entitled to summary judgment based on qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation." Capps v. Olson, 780 F.3d 879, 884 (8th Cir. 2015).

The Supreme Court has granted lower courts the latitude to determine "which of the two prongs of qualified-immunity analysis to tackle first." Ashcroft v. al-Kidd, 563 U.S.

731, 735 (2011). Accordingly, the Court will first analyze whether the evidence establishes a violation of a federal constitutional or statutory right.

### 2. Violation of a Constitutional Right

"Since this case presents an issue of whether an officer used excessive force, the case must be analyzed under the Fourth Amendment's objective reasonableness standard." Craighead v. Lee, 399 F.3d 954, 961 (8th Cir. 2005).

> [P]roper application [of the objective reasonableness standard] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Graham v. Connor, 490 U.S. 386, 396 (1989) (citation omitted). When applied to excessive-force claims, "the test is whether the amount of force used was objectively reasonable under the particular circumstances." Greiner v. City of Champlin, 27 F.3d 1346, 1354 (8th Cir. 1994). These considerations should be made without regard for the officer's subjective intent or motivation. Graham, 490 U.S. at 397.

Lopez argues that Rodin's choice to take him to the ground was unreasonable because force was unnecessary at that time. To justify using force on an individual without violating the Fourth Amendment's proscription against an unreasonable seizure, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Andrews v. Fuoss, 417 F.3d 813, 817 (8th Cir. 2005) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968). Lopez asserts that he was walking to the holding cell as directed. However, the testimony and video evidence belie this assertion, and present articulable facts that justify the officers'

6

use of force. The officers testified that Lopez repeatedly stopped to talk to the public, and they had to hold his arms to keep him moving to the holding cell. Additionally, Rodin testified that Lopez threatened to put Rodin's "face into the concrete." (Rodin Dep. at 54). Lopez also resisted Rodin's attempts to guide him forward, turned to face Rodin, and reached for Rodin's chest just before the takedown. Lopez's threat and lack of cooperation demonstrate that it was objectively reasonable for Rodin to take Lopez to the ground in order to handcuff him and move him to the holding cell.

The officers' use of force after the takedown was also reasonable. Lopez struggled and wrestled with the officers while on the ground. During the struggle, Lopez's arms and hands were located at Cragin's waist, in the area of his utility belt. Cragin testified that Lopez was grabbing at various items on his belt throughout the altercation, including his taser and firearm. (Cragin Dep. at 22.) Lopez claims that he wanted to place his hands behind his back but could not because Cragin was holding them in place. (Pl.'s Opp'n Mem. at 28.) However, the video belies this assertion because after Rodin gained control of Lopez's right arm, Lopez continued to use his left arm. Rodin's use of knee/hand strikes and Cragin's use of a taser gun were reasonably necessary to stop Lopez from struggling and pulling Cragin's belt. Just before Cragin used his taser, the video shows Lopez pulling on Cragin's firearm. In response, Hodynsky stepped in and pulled Lopez's hand away. Before this action, Hodynsky had not interfered with the confrontation in any way. In the holding cell, Hodynsky confirmed the motivation for his actions by telling the officers, "he reached for your guys' gun and all that." (Defs.' Supp. Mem. (Docket No. 243) at 12.)

7

Finally, as soon as the taser incapacitated Lopez, he placed his hands above his head and the officers were able to handcuff him without using additional force.

Considering the evidence in the light most favorable to Lopez, there is no genuine issue of material fact as to objective reasonableness. Lopez has only provided his own version of the events, which he cannot remember, and which the video evidence and the officers' testimony directly contradicts. The force the officers employed was reasonable, and there was no constitutional violation. Defendants are entitled to summary judgment based on qualified immunity.

### 3. Clearly Established Right

The Supreme Court has emphasized that courts need not address both prongs of the qualified immunity analysis if doing so will have "no effect on the outcome of the case." Ashcroft, 563 U.S. at 735. Having determined that Lopez has not established a violation of his constitutional rights, his § 1983 claim fails.

## B. Remaining Claims

As noted, Lopez has abandoned many of his claims. The only remaining claims are for assault, battery, negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, false arrest, false imprisonment, and respondeat superior.

### 1. Assault, Battery, Negligence, Negligent Infliction of Emotional Distress, Respondeat Superior – Negligence

Defendants claim that they are entitled to "official immunity" under Minnesota law, which serves as a defense to the assault, battery, negligence, negligent infliction of emotional distress, and "respondeat superior – negligence" claims.

"As distinguished from the 'qualified immunity' afforded peace officers when addressing 42 U.S.C. § 1983 claims, under Minnesota law a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion." Johnson v. Morris, 453 N.W.2d 31, 41 (Minn. 1990). The official immunity doctrine applies to police officers in situations like the one presented here, unless the official committed a willful or malicious wrong. Pletan v. Gaines, 494 N.W.2d 38, 40 (Minn. 1992). When considering whether an official has acted willfully or maliciously, courts "'consider whether the official has intentionally committed an act that he or she had reason to believe is prohibited.' This 'contemplates less of a subjective inquiry into malice, which was traditionally favored at common law, and more of an objective inquiry into the legal reasonableness of an official's actions.'" Hassan v. City of Minneapolis, 489 F.3d 914, 920 (8th Cir. 2007) (quoting State by Beaulieu v. City of Mounds View, 518 N.W.2d 567, 571-72 (Minn. 1994)).

"Because the facts establish the officers' use of [] force was reasonable, a reasonable fact finder could not conclude the officers' conduct was willful or malicious." Id. Therefore, the officers are entitled to official immunity on these state-law claims and summary judgment in Defendants' favor is proper.

### 2. False Imprisonment and False Arrest

Lopez argues that there was no probable cause to arrest him and therefore he was falsely arrested and imprisoned. "Under Minnesota law, police officers falsely arrest or imprison a plaintiff if they arrest or detain him 'without proper legal authority.'" Waters v. Madson, 921 F.3d 725, 743 (8th Cir. 2019) (quoting Lundeen v. Renteria, 224 N.W.2d

9

132, 135 (Minn. 1974)). "Probable cause exists when the totality of the circumstances shows that a prudent person would believe that the arrestee has committed a crime." Amrine v. Brooks, 522 F.3d 823, 832 (8th Cir. 2008). Courts must give officers "substantial latitude in interpreting and drawing inferences from factual circumstances." United States v. Washington, 109 F.3d 459, 465 (8th Cir. 1997) (quotation omitted).

As stated above, Lopez acted disorderly in the stands, refused to follow the officers' commands, threatened Officer Rodin, actively struggled with the officers, and attempted to gain control of Officer Cragin's firearm and taser. Given the totality of the circumstances, the officers could reasonably have believed that Lopez committed a multitude of crimes at various stages of the encounter, including disorderly conduct (Minn. Stat. § 609.72, subd. 1(3)), obstructing legal process (id. § 609.50, subd. 1(2)), or attempted disarming of a peace officer (id. § 609.504, subd. 2). Defendants are entitled to summary judgment on these claims.

### 3. Intentional Infliction of Emotional Distress

Intentional infliction of emotional distress consists of four elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 438-39 (Minn. 1983). Because the officers' conduct was objectively reasonable, Lopez cannot establish that the conduct was "extreme and outrageous." See Cook v. City of Minneapolis, No. 16cv579, 2007 WL 1576122, at *8 (D. Minn. May 31, 2007) (Frank, J.) (holding that officers' objectively reasonable but

10

violent actions in responding to a high-risk situation did not rise to the level of extreme and outrageous conduct). Therefore, this claim must also fail.

C. **Daubert Motions**

Defendants filed three Motions to Exclude Expert Testimony in this matter. One of these Motions sought to exclude the expert testimony of James Pierson. (Docket No. 245.) On April 19, 2019, Magistrate Judge Tony Leung ruled that Pierson's report constituted improper rebuttal and struck the report pursuant to Fed. R. Civ. P. 37(c)(1). (Docket No. 264 at 11.) There has been no briefing regarding Defendants' Motion to Exclude Pierson's testimony since Magistrate Judge Leung's Order. Accordingly, that Motion as moot. Having granted Defendants' Motion for Summary Judgment, Defendants' remaining Motions to Exclude Expert Testimony are also moot.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED that:**

1. Defendants' Motion for Summary Judgment (Docket No. 242) is **GRANTED**; and

2. Defendants' Motions to Exclude Expert Testimony (Docket Nos. 245, 250, 256) are **DENIED as moot**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 23, 2019

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge